# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-008

Filing Date: August 30, 2019

No. S-1-SC-36394

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DAVID GUTIERREZ II,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew Douglas Tatum, District Judge**

Released for Publication March 9, 2021.

Stephen D. Aarons
Aarons Law Firm PC
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Marko David Hananel, Assistant Attorney General
Santa Fe, NM

for Appellee

James Walker Boyd
Carter B. Harrison
Peifer, Hanson & Mullins, P.A.
Albuquerque, NM

for Amicus Curiae, New Mexico Criminal Defense Lawyers Association

## OPINION

**NAKAMURA, Chief Justice.**

**{1}** In 2002, Defendant David Gutierrez shot and killed a man. Gutierrez disclosed this fact to his wife and threatened to kill her if she ever told anyone about the murder.

They divorced a short time later. Gutierrez remarried and also told his second wife about the murder.  By the time of his 2017 murder trial, Gutierrez was estranged from his second wife.  At trial, he invoked the spousal communication privilege to preclude both women from testifying about his role in the killing.  Gutierrez's invocation of the spousal communication privilege prompts us to question its continued viability in New Mexico.

{2}     We conclude that the spousal communication privilege has outlived its useful life and prospectively abolish it.  As abolishment is prospective, we must evaluate its applicability in Gutierrez's case.  We conclude that certain evidence was admitted at Gutierrez's trial in violation of the privilege, but conclude that the error was harmless. We reject all other arguments advanced by Gutierrez and affirm his convictions.

## I.     BACKGROUND

{3}     On April 8, 2002, Jose Valverde was found dead in a boxcar he used as his home in Clovis, New Mexico.  He had been shot in the head with a shotgun.  In July 2015, more than thirteen years later, a grand jury indicted Gutierrez for the murder. Gutierrez's trial commenced in 2017.

{4}     Gutierrez's ex-wife Nicole Cordova offered the following testimony at trial.  She married Gutierrez in 2002, and the marriage lasted only two years.  The victim, her uncle, had raped her several times when she was thirteen or fourteen years old.  She told Gutierrez about the rapes some months before the victim was killed, and Gutierrez told her "not to worry about anything anymore."  At the time the victim was killed, she and Gutierrez were living with his parents.  On the day of the murder, Gutierrez left home for about a half hour and was visibly upset when he returned. Gutierrez told her that he "took care of it," and although he did not explain further, she knew what had happened:  Gutierrez had killed the victim.  Gutierrez told her that he needed help to find a shotgun shell and then they drove to the victim's boxcar. When she entered the boxcar, she saw that it was in disarray and that the victim's body was face down on the floor. She sifted through some beer cans, found a shotgun shell, and then walked outside.  After she and Gutierrez returned home, he put the clothes and shoes he had been wearing into a bag and left with his father and brother to dispose of them. Gutierrez later threatened that she would suffer the same fate as the victim if she ever told anyone about what happened.  The police questioned her on the day of the murder but she lied to them and never told anyone about Gutierrez's conduct or what had occurred because she was afraid of him.  The police did not contact her again until a couple of years before trial when she finally told the truth.

{5}     Gutierrez's second wife, Evelyn Franco, also testified at Gutierrez's trial and offered the following testimony.  She married Gutierrez in May 2006.  At the time of trial, they were still legally married but had not spoken in years.  In early 2006, she and Gutierrez lived with his parents.  There was frequent fighting and arguing in the household.  During these fights, Gutierrez's parents would threaten to "send him away for the rest of his life."  When she asked Gutierrez what his parents were talking about, he informed her that he had committed a murder.  He elaborated that his ex-wife's uncle

had molested her, so he went to his house, walked up to where he was laying on the couch, and fired a shotgun into his face killing him.

**{6}** The jury found Gutierrez guilty of willful, deliberate, and premeditated first-degree murder in violation of NMSA 1978, Section 30-2-1(A)(1) (1994). The district court sentenced Gutierrez to life imprisonment plus one year. He appeals directly to this Court. *See* N.M. Const. art. VI, § 2; Rule 12-102(A)(1) NMRA.

## II.    DISCUSSION

**{7}** Gutierrez raises five issues: (A) violation of the spousal communication privilege, (B) the sufficiency of the evidence to support the convictions, (C) violation of his right to testify before the grand jury, (D) destruction of evidence favorable to the defense, and (E) ineffective assistance of counsel. We address each issue in turn. Because we abolish the spousal communication privilege prospectively, we must also address its applicability in Gutierrez's case. Accordingly, the privilege issue is addressed in two parts.

## A.    Spousal Communication Privilege

**{8}** Subsection B of Rule 11-505 NMRA, New Mexico's spousal communication privilege, provides that "[a] person has a privilege to refuse to disclose, or to prevent another from disclosing, a confidential communication by the person to that person's spouse while they were married." This privilege "prohibits one spouse from testifying as to conversations or communications with the other spouse made in confidence during their marriage." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 505.03[1], at 505-5 (Mark S. Brodin, ed., Matthew Bender 2d ed. 2018). The privilege protects confidential communications at the time they are made and may, therefore, be invoked after the termination of the marital relationship. *See id.*

### 1.    Continued viability of the spousal communication privilege in New Mexico

#### a.    *Evidentiary privileges and this Court's authority over them*

**{9}** This Court's constitutional authority to recognize or limit evidentiary privileges derives from the power of superintending control set forth in Article III, Section 1 and Article VI, Section 3 of the New Mexico Constitution. *See Estate of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 7, 139 N.M. 671, 137 P.3d 611. This Court determines whether and to what extent an evidentiary privilege should be permitted to "interfere with the orderly and effective administration of justice." *See Ammerman v. Hubbard Broad., Inc.*, 1976-NMSC-031, ¶¶ 7, 17, 89 N.M. 307, 551 P.2d 1354 (internal quotation marks and citation omitted). For this reason, the existence of NMSA 1978, Section 38-6-6 (1973) has little bearing upon whether New Mexico courts should continue to recognize the spousal communication privilege. This question is one bearing upon practice and procedure and, therefore, is one over which this Court has ultimate authority. *See Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶

11, 138 N.M. 398, 120 P.3d 820 ("[I]f a privilege is not recognized or required by the New Mexico Constitution or court rule, then the Legislature may not enact such a privilege because to do so would conflict with Rule 11-501."); *see also Ammerman*, 1976-NMSC-031, ¶ 15 ("Our constitutional power . . . of superintending control over all inferior courts carries with it the inherent power to regulate all pleading, practice and procedure affecting the judicial branch of government." (internal quotation marks and citation omitted)). Whether our courts should continue to recognize any given privilege requires a balancing of competing concerns of the broadest kind.

**{10}** The administration of justice is coextensive with the pursuit of truth, and but for certain well-defined exceptions, all persons can be compelled to appear in court and give testimony to accomplish this end. *See Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting). ("[T]he underlying aim of judicial inquiry is ascertainable truth[.]"). Limitations on this fundamental rule shall be recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence" produces a "public good" that transcends "the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.*

**{11}** Similarly, "[t]he purpose of the rules of evidence is to ascertain the truth by determining what evidence is admissible during the trial." *Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 21, 144 N.M. 601, 190 P.3d 322. Consistent with this purpose, all persons generally are required to "disclose any information" that they "may possess that is relevant to a case pending before a court of justice." *Estate of Romero*, 2006-NMSC-028, ¶ 7 (internal quotation marks and citation omitted). An evidentiary privilege constitutes an exception to this general rule and permits a person to withhold probative evidence. *See id.*

**{12}** Evidentiary privileges "'are not lightly created nor expansively construed'" because "'they are in derogation of the search for truth.'" *Albuquerque Rape Crisis Ctr.*, 2005-NMSC-032, ¶ 18 (quoting *United States v. Nixon*, 418 U.S. 683, 709-10 (1974)). We thus consider whether the spousal communication privilege promotes "sufficiently important interests to outweigh the need for probative evidence." *See Trammel v. United States*, 445 U.S. 40, 51 (1980). In doing so, we examine both the justifications advanced in support of the privilege and criticisms of it. Before doing that, one final comment is necessary.

**{13}** Secondary literature discussing the spousal privileges abounds. That literature illuminates much. The earliest iterations of the spousal privilege can be traced to feudal England. 8 John Henry Wigmore, *Evidence in Trials at Common Law*, § 2227, at 211 (McNaughton rev. 1961). The privilege took different forms at different points in history, evolved over time, and has not been discussed in uniform terminology. 25 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence*, § 5572, at 463-64 (1989) (explaining that the spousal privileges have been given "a wide variety of names" and lamenting the lack of uniformity); 2 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 5:39, at 729 (4th ed. 2013) (discussing the spousal witness privilege); *Trammel*, 445 U.S. at 44 (discussing the spousal disqualification rule). This present case is not the first time New Mexico courts have questioned the

utility and validity of the spousal privileges. *See State v. Howell*, 1979-NMCA-069, ¶ 9, 93 N.M. 64, 596 P.2d 277 (citing with approval authorities doubting the validity of the spousal privilege then in existence in New Mexico); Richard A. Gonzales, *Evidence*, 11 N.M. L. Rev. 159, 174-75 (1981) (discussing amendments to New Mexico's rules of evidence that eliminated one iteration of the spousal privilege).

**{14}** The existence of abundant secondary literature is no justification for us to write yet another treatise on the subject of the history and development of the spousal privilege we have today. Our focus is specific. Our task discrete. We are here concerned with the spousal communication privilege as it exists in New Mexico and to the merits of the policy justifications offered in support of the privilege as measured from the ground upon which we stand. While it is necessary to consider some aspects of the history of spousal privilege to understand the purpose of the privilege we have today, we discuss that history only to the limited extent necessary. Readers interested in legal history as an end in itself may explore—as we have—the many secondary sources cited throughout the discussion that follows.

*b.     Justifications for the spousal communication privilege*

**{15}** More than one hundred and eighty years ago, the United States Supreme Court described the policy concerns giving rise to the spousal communication privilege in the following manner:

> This rule is founded upon the deepest and soundest principles of our nature. Principles which have grown out of those domestic relations, that constitute the basis of civil society; and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence.

*Stein v. Bowman*, 38 U.S. 209, 223 (1839). The principles articulated in *Stein* developed into what most commentators characterize as the traditional justification for the privilege: it "is needed to encourage marital confidences, which confidences in turn promote harmony between husband and wife." 1 Kenneth S. Broun, *McCormick on Evidence*, § 86, at 523 (7th ed. 2013); *see also* 25 Wright & Graham, *supra*, § 5572, at 518-19 (explaining that the rationale set forth in *Stein* has "been only slightly clarified in the ensuing 150 years"); *see Wolfle v. United States*, 291 U.S. 7, 14 (1934) ("The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."). The traditional justification for the privilege is considered to be an instrumental or utilitarian rationale because it views the privilege as a way to promote "the public good" by protecting the marital relationship. *See* R. Michael Cassidy, *Reconsidering Spousal Privileges After Crawford*, 33 Am. J. Crim. L. 339, 358 (2006) .

**{16}**     In addition to the traditional justification, a variety of humanistic and privacy arguments have been offered to support the spousal communication privilege.  *See* 1 Broun, *supra*, § 72, at 467-68; *see also e.g.*, *Ryan v. Comm'r of Internal Revenue*, 568 F.2d 531, 543 (7th Cir. 1977) (recognizing that the spousal communication privilege protects "the privacy interests of husband and wife").  Unlike the traditional justification, which views the privilege "as a means of promoting the public good," the privacy and humanistic "theories focus on the value of protecting individual rights."  Harvard Law Review Association, *Developments in the Law: Privileged Communications*, 98 Harv. L. Rev. 1450, 1583 (1985); *see also* 1 Broun, *supra*, § 72, at 468 ("[P]rivacy interests in society are deserving of protection by privilege irrespective of whether the existence of such privileges actually operates substantially to affect conduct within the protected relationships.").

**{17}**     One such justification offered for the spousal communication privilege is that it eliminates the "'natural repugnance'" that would necessarily flow from forcing a person to testify against a spouse.  *See* 1 Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence*, § 2.3, at 136-37 (2d ed. 2010) (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law*, § 2228, at 217 (1961)); *see also* 2 Mueller & Kirkpatrick, *supra*, § 5:39, at 731 ("[P]itting spouse against spouse . . . is deeply offensive to widely shared values."); 1 Broun, *supra*, § 86, at 524 ("All of us have a feeling of indelicacy and want of decorum in prying into the secrets of husband and wife.").  Leading treatises surmise that this "matter of emotion and sentiment" has, in fact, been "the prime influence in creating and maintaining" the spousal communication privilege.  1 Broun, *supra*, § 86, at 524.

**{18}**     The protection of informational privacy and avoidance of unwarranted governmental intrusion are offered as alternative justifications for the privilege.  *See, e.g.*, Mark Reutlinger, *Policy, Privacy, and Prerogatives: A Critical Examination of the Proposed Federal Rules of Evidence as They Affect Marital Privilege*, 61 Calif. L. Rev. 1353, 1371 (1973) ("[U]tter freedom of marital communication from all government supervision, constraint, control or observation [is] a psychological necessity to successful marriage." (internal quotation marks and citation omitted)).  This "rationale recognizes that it is morally repugnant to require the disclosure of certain private information or to force an otherwise honest and decent person to choose among betraying his or her spouse, lying, or going to jail."  Mikah K. Story, *Twenty-First Century Pillow-Talk: Applicability of the Marital Communications Privilege to Electronic Mail*, 58 S.C. L. Rev. 275, 315 (2006).  One federal court quite persuasively made the case for the privacy justification for the privilege.

> Over at least the past decade, the circle of privacy surrounding each of us has drawn smaller with each new governmental incursion and each new technological advance.  Courts have sought to preserve inviolable some small island of privacy as a refuge for the human spirit where government may not intrude.  Here the question is whether one such sanctuary, protected by the common law for centuries, shall be breached, rendering the secrets told to wives by husbands fair game for government investigators.

*United States v. Neal*, 532 F. Supp. 942, 946 (D. Colo. 1982), *aff'd*, 743 F.2d 1441 (10th Cir. 1984); *see also* 25 Wright & Graham, *supra*, § 5572, at 524  (expressing the idea that "limitation on government power . . . is inherently valuable and ought to be fostered for its own sake").  This privacy rationale carries significant weight.

{19}   The United States Supreme Court has recognized that married people have a constitutional right to privacy in their intimate relationships.  *See Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965) (concluding that the "right to privacy" in the marital relationship is "older than the Bill of Rights").  Thus, commentators have relied on this right to privacy to conclude that "the abolition of the [spousal communication] privilege would offend the spirit of the constitutional guarantees."  25 Wright & Graham, *supra*, § 5572, at 528 (internal quotation marks and citation omitted).

{20}   Finally, a "humanistic theory based on the protection of autonomy" has been utilized to evaluate privileges generally.  *See* 1 Imwinkelried, *supra*, § 1.2.1, at 16 (arguing that the recognition of evidentiary privileges for certain fundamental relationships "promotes personal autonomy in the sense of decisional privacy"); *see also* Thomas G. Krattenmaker, *Testimonial Privileges in Federal Courts: An Alternative to the Proposed Federal Rules of Evidence*, 62 Geo. L. J. 61, 87 (1973) (arguing that the "recognition of a right to privacy serves to promote and protect personal autonomy").  Under this line of thought, personal autonomy is accepted as an "ultimate value" in a "democratic society."  1 Imwinkelried, *supra*, § 1.2.1, at 16; *see* Krattenmaker, *supra*, at 88-89 (explaining that the protection of privacy supports "individual political freedom," which in turn supports democracy); *see also* 1 Broun, *supra*, § 72, at 468 (protecting private communications enables people "to make more intelligent, independent life preference choices").  Whether this line of thought has figured into or has any value to the debate about the benefits of the spousal communication privilege is an open question.  *See* 1 Broun, *supra*, § 72, at 468 ("Given [the] comparatively recent origin [of the humanistic, autonomy rationales, they] probably have not operated as a conscious basis for either the judicial or legislative creation of existing privileges.").

c.      *Criticisms of the spousal communication privilege*

{21}   When scrutinized, the traditional justification for the spousal communication privilege is not as forceful as it may initially seem.  One of its principal weaknesses is that it rests on two untested assumptions:  that (1) married people know the privilege exists, and (2) they rely on it when deciding how much information to share.  *See* 1 Broun, *supra*, § 86, at 523.  Critics argue "that there is no empirical evidence to support [these] factual assumptions."  25 Wright & Graham, *supra*, § 5572, at 532-33.

{22}   As to the first of these assumptions, it is likely that most people are entirely unaware of the privilege. *See, e.g.*, Robert M. Hutchins & Donald Slesingert, *Some Observations on the Law of Evidence Family Relations*, 13 Minn. L. Rev. 675, 682 (1929).  The United States Supreme Court, agreeing with this assessment, omitted the spousal communication privilege from the Court's proposed rules of evidence.  *See Rules of Evidence for United States Courts and Magistrates*, 56 F.R.D. 183, 246, Advisory Committee's Note to Rule 505 (1973) ("Nor can it be assumed that marital

conduct will be affected by a privilege for confidential communications of whose existence the parties in all likelihood are unaware.").

{23}    Even if married people are aware of the spousal communication privilege, it is unclear whether the availability of the privilege has any effect on the extent to which spouses communicate.  1 Broun, *supra*, § 86, at 523 (observing that "the contingency of courtroom disclosure" is not "in the minds of [spouses] in considering how far they should go in their secret conversations").  This point, explained in greater detail in the succeeding paragraphs, significantly undermines the second assumption underlying the traditional justification.

{24}    In a relationship involving a layperson and a professional, the absence of a privilege protecting confidentiality could chill beneficial communication because the layperson might refuse to communicate with the professional.  *See, e.g.*, *Fisher v. United States*, 425 U.S. 391, 403 (1976) (explaining that the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege"); *Albuquerque Rape Crisis Ctr.*, 2005-NMSC-032, ¶ 16 ("Without the psychotherapist-patient privilege, many individuals would likely be reluctant to seek treatment.").  And in a professional relationship that depends heavily on confidentiality, "there is an evidentiary wash—while evidence might be excluded at trial pursuant to a privilege objection, but for the privilege the evidence would not have come into existence." 1 Imwinkelried, *supra*, § 3.2.3, at 163 (footnote, internal quotation marks, and citation omitted); *e.g.*, *Swidler & Berlin v. United States*, 524 U.S. 399, 408 (1998) ("[T]he loss of evidence admittedly caused by the [attorney-client] privilege is justified in part by the fact that without the privilege, the client may not have made such communications in the first place."); *Jaffee v. Redmond*, 518 U.S. 1, 11-12 (1996) (concluding that any evidentiary benefit of rejecting the psychotherapist-patient privilege would be modest because the absence of the privilege would chill communications).  Unlike communication between a professional and a layperson, communication between spouses does not depend on a legal guarantee of confidentiality and does not come into existence because of that guarantee.

{25}    Spouses communicate openly with one another due to the "trust they place in the loyalty and discretion of each other," not because the privilege shields their communications from future disclosure in court.  1 Broun, *supra*, § 86, at 523.  Additionally, most people are unlikely to alter their behavior based on the privilege because most people seldom appear in court and do not tailor their conversations around what may or may not be privileged.  *See id.* at 523-24 ("In the lives of most people appearance in court as a party or a witness is an exceedingly rare and unusual event, and the anticipation of it is not one of those factors which materially influence in daily life the degree of fullness of marital disclosures.").  Because neither assumption underlying the traditional justification survives scrutiny, the traditional justification for the privilege seems entirely unfounded.

{26}    As with the traditional justification, questions have been raised as to whether the privacy and humanistic rationales are sufficient to justify recognition of the spousal communication privilege.  For example, Wigmore argued that the natural repugnance

people feel about compelling one spouse to testify against the other is nothing "more than a sentiment" and that sentimental feelings do not justify interference with courts' truth-seeking function. 8 Wigmore, *supra*, § 2228, at 217; *see id.* ("[T]he law . . . does not proceed by sentiment, but aims at justice."); *see also* Edmund M. Morgan, *Foreword*, *Model Code of Evidence*, A.L.I., at 5 (1942) (arguing that "a mere sentiment or an outgrown theory as to relative social values" cannot justify the suppression of "valuable evidence"). Others have "argued that married couples no longer care about privacy as it was supposed they did in an agrarian society." 25 Wright & Graham, *supra*, § 5572, at 538. The increasing frequency with which modern Americans share their marital and familial problems with a public audience provides "contemporary confirmation for the claim that marital privacy is no longer an esteemed value." *See id.* at 539.

{27}    To the extent that protecting marital privacy is a legitimate goal of a rule of evidence, the spousal communication privilege has been criticized as inadequate and under-inclusive. As the privilege has been construed to protect only those "interactions through which one spouse intends to convey a message to the other," the privilege does not apply to "some of the most personal and intimate interactions between spouses." Amanda H. Frost, *Updating the Marital Privileges: A Witness-Centered Rationale*, 14 Wis. Women's L.J. 1, 25 (1999). For instance, the privilege would not permit a spouse to decline to testify as to whether his or her spouse uttered inculpatory remarks in their sleep or if they exhibited other irrepressible behaviors like nervousness, tiredness, or illness. *Id.* This is significant as "it is precisely at these private moments when the social mask is removed, and a spouse engages in unguarded, unfiltered behavior[.]" *Id.*

{28}    This point highlights the obvious fact that marriage is a very different endeavor and involves communication quite distinct from that which occurs in a relationship between laypersons and professionals, like doctors and lawyers. Married couples necessarily engage in a nearly unlimited range of possible communicative acts the spousal communication privilege might never reach. Communication between laypersons and professionals, on the other hand, "are essentially and almost exclusively verbal in nature, quite unlike marriage." Advisory Committee's Note to Rule 505, 56 F.R.D. at 246. So, while the efficacy of the privileges protecting the communications between laypersons and professionals seems quite sensible and self-evidently efficacious, the efficacy of the spousal communication privilege to protect and foster frank communication between spouses appears, in contrast, quite doubtful.

{29}    Critics have also looked to the ancient origins of the spousal communication privilege and its disparate gender impact to argue that the privilege has outlived its purpose. *See* 25 Wright & Graham, *supra*, § 5572, at 466 (observing that modern theorists have attacked the spousal privileges and the familial privileges more generally as relics of "ancient origins" that should be a "source of scorn rather than admiration" and derided these "sentimental relics" as patently incompatible with the modern and "changed social context" of present society (internal quotation marks and citation omitted)). Blackstone described the legal principles—which by contemporary values can only be deemed misogynistic—that coincided with the creation of the privilege as follows: "By marriage the husband and wife are one person in law; that is, the very

being or legal existence of the woman is suspended during the marriage or at least is incorporated or consolidated into that of the husband." *Id.* at 490 (internal quotation marks omitted) (quoting 1 William Blackstone, *Commentaries on the Law of England*, 442 (1768)). These words make obvious why some commentators suggest that "the most serious concern about the privilege is its disparate gender impact[.]" Milton C. Regan, Jr., *Spousal Privilege and the Meanings of Marriage*, 81 Va. L. Rev. 2045, 2051 (1995).

**{30}** Despite drastic changes in law and society since Blackstone's day, "the [spousal] communications privilege perpetuates the role of male domination in the marriage because a husband usually invokes the privilege to prevent his wife's disclosure of confidential communications, thereby benefiting men more often than women." Story, *supra*, at 280 (internal quotation marks and citation omitted); *see also* Harvard Law Review Ass'n, *supra*, at 1587 & n.170 (noting that "in practice, marital privileges are more likely to protect male confidences than female confidences" and citing evidence that indicates that ninety percent of spousal privilege cases involve wives testifying against husbands).

**{31}** Feminist scholars have vigorously attacked the privilege suggesting that it was "created to protect men, who are often reluctant to share their personal thoughts and therefore may need the assurance of protection that the privilege rules supply, rather than women, who are more likely to decide to confide in others independent of the evidentiary safeguard." Kit Kinports, *Evidence Engendered*, 1991 U. Ill. L. Rev. 413, 440 (1991). They contend that "privacy is frequently used as an excuse to isolate the family from interference by the state, perpetuating traditional gender hierarchies and power imbalances." Frost, *supra*, at 24. The rhetoric of "privacy," these theorists contend, simply ignores the fact that women are all too frequently the victims of a pernicious form of unseen and "private" violence and that appeals to privacy have rhetorical value in the abstract but are nothing short of repressive when applied to the actual social circumstances confronting women in our society.

> Privacy says that violence against women is immune from sanction, that it is permitted, acceptable and part of the basic fabric of American family life. Privacy says that what goes on in the violent relationship should not be the subject of state or community intervention. Privacy says that it is an individual, and not a systemic problem. Privacy operates as a mask for inequality, protecting male violence against women.

Malinda L. Seymore, *Isn't it a Crime: Feminist Perspectives on Spousal Immunity and Spousal Violence*, 90 Nw. U. L. Rev. 1032, 1072-73 (1995-96) (internal quotation marks and citation omitted).

d.    *Weighing the justifications and criticisms*

**{32}** The traditional justification for the spousal communication privilege is premised on assumptions that do not withstand scrutiny. The privacy and humanistic justifications, when closely examined, seem little more than soaring rhetoric and legally

irrelevant sentimentality.  The misogynistic history of the privilege is obvious and odious.  And it appears that the existence of the privilege perpetuates gender imbalances and, most critically, may even be partly responsible for sheltering and occluding marital violence that disproportionately affects women in entirely unacceptable ways.

**{33}**   Our review of the justifications for and criticisms of the privilege leaves us in agreement with Wigmore:  "the occasional compulsory disclosure in court of even the most intimate marital communications would not in fact affect to any perceptible degree the extent to which spouses share confidences."  8 Wigmore, *supra*, § 2332, at 642.  Gutierrez's invocation of the privilege illustrates this point vividly and assures us that we have correctly weighed the competing interests and our decision to abandon the privilege is correct.

**{34}**   Gutierrez's decision to talk about the murder with his wives was not premised on any legal guarantee of confidentiality; to the contrary, he not only told his wives about the killing but also bragged about the murder to third parties who were not covered by the privilege.  Gutierrez's case also illustrates that abolishment of the privilege is unlikely to chill candor between spouses, one of the putative reasons for recognizing the privilege.

**{35}**   Gutierrez told Nicole about the murder not because he required a confidant he knew could not divulge information shared; rather, he told Nicole about the murder because, it seems, he surmised that she would be pleased by what he had done.  He then threatened her with death if she ever divulged the secret to anyone.  Similarly, Evelyn learned of Gutierrez's role in the murder not because Gutierrez perceived her as a person legally obligated to maintain confidences, but because Gutierrez's parents—who knew about Gutierrez's role in the victim's death—spoke openly about the killing in only the most thinly-veiled terms and threatened to expose him to the criminal consequences of the act.  It is clear the spousal communication privilege, and the principles the privilege was intended to advance, played no role whatsoever in Gutierrez's decision to disclose to Nicole and Evelyn the fact that he killed the victim.

**{36}**   While the purported benefits of the spousal communication privilege are questionable, the resulting loss of evidence is nearly certain.  Again, Gutierrez's case amply demonstrates this point.

**{37}**   Gutierrez used threats and intimidation to silence Nicole, and when Nicole finally agreed to testify against him—thirteen years after she divorced him—he invoked the spousal communication privilege to suppress the truth.  Evelyn described the fighting that had typified her relationship with Gutierrez and testified at trial that she had not spoken to him in years.  Permitting Gutierrez to use the spousal communication privilege to block the testimony of Nicole and Evelyn would have deprived the court of probative evidence without advancing spousal communication or marital harmony in any way.  In Gutierrez's case, application of the spousal communication privilege would only subvert the fair administration of justice and would not advance any socially beneficial interest.

*e. Conclusion: prospective abolition*

**{38}** This Court has a constitutional duty to ensure that the pursuit of truth is not unduly undermined by a procedural rule that has outlived its justification. Having carefully examined the spousal communication privilege, we cannot accept that it meaningfully encourages marital confidences, promotes marital harmony, or produces any substantial public benefit that justifies its continued recognition. Rather, we believe that the privilege is a vestige of a vastly different society than the one we live in today and has been retained in New Mexico simply through inertia.

**{39}** "[W]e cannot escape the reality that the law on occasion adheres to doctrinal concepts long after the reasons which gave them birth have disappeared and after experience suggest[s] the need for change." *Trammel*, 445 U.S. at 48. We conclude that the spousal communication privilege is such a concept. Accordingly, we prospectively abolish it and withdraw Rule 11-505, effective for all cases filed on or after the date this opinion is filed. Because abolishment is prospective, we must nonetheless assess its applicability in Gutierrez's case.

**2. Application of the spousal communication privilege in Gutierrez's case**

**{40}** The district court permitted Nicole and Evelyn to testify about confidential, spousal communications because, according to the district court, Gutierrez waived the privilege by telling third parties about the subject matter of those communications, i.e., he told individuals other than his wives that he murdered the victim. Gutierrez argues that the district court's ruling was error and that Nicole's and Evelyn's testimony about these confidential, spousal communications should not have been admitted. The State responds that the district court correctly concluded that Gutierrez waived the spousal communication privilege. These arguments require us to clarify the circumstances under which a party waives the spousal communication privilege and, because we conclude that there was no waiver here, to address whether the confidential, spousal communications Nicole and Evelyn offered at trial were admissible on other grounds. If not, we must decide what consequence flows from the erroneous admission of any confidential, spousal communications. This Court reviews the district court's construction of privilege law de novo. *See Pacheco v. Hudson*, 2018-NMSC-022, ¶ 24, 415 P.3d 505.

*a. Waiver*

**{41}** Rule 11-511 NMRA, the waiver rule, provides that "[a] person who possesses a privilege against disclosure of a confidential matter or communication waives the privilege if the person voluntarily discloses or consents to disclosure of any significant part of the matter or communication." *State v. Allen*, 2000-NMSC-002, 128 N.M. 482, 994 P.2d 728, is the only published New Mexico opinion addressing waiver of the spousal communication privilege and both parties rely on *Allen* to support their respective positions. Some clarification of the principles articulated in *Allen* are necessary.

**{42}** In *Allen*, the defendant told his wife that "he had raped and killed a girl, and that . . . he killed the girl because she threatened to report the rape to the police." *Id.* ¶ 18. Allen's wife disclosed the statement to the police, who incorporated the statement into an affidavit and gave a copy to Allen. *Id.* ¶¶ 18, 20. When the police asked Allen about the statement, he "admitted that he had made the statement to his wife, but he claimed that the statement was a lie." *Id.* ¶ 19. Allen also "showed the affidavit to a co-worker and acknowledged . . . that he had made a statement similar to the one contained in the affidavit. Later, he discussed the statement again with a jail inmate." *Id.* ¶ 20. On appeal, this Court held that Allen waived the spousal communication privilege "by disclosing the statement at issue to third parties." *Id.* ¶ 24. *Allen* did not adequately highlight the distinction between disclosing a confidential, spousal communication to a third party and disclosing only the underlying subject matter of a spousal communication. This distinction is all important.

**{43}** The defendant in *Allen* disclosed the actual statement he made to his wife, which was memorialized in an affidavit. The defendant admitted to police that he made the statement to his wife and also disclosed to a coworker and a jail inmate the fact that he made a statement to his wife. *Id.* ¶¶ 18-20. Critically, Allen did not merely discuss his crimes—he raped and then killed a young woman—with a third party. The crucial point is this: Allen waived the spousal communication privilege by disclosing to others *that he told his wife* that he raped and killed the victim. *Id.* ¶ 24. He did not merely tell others he raped and killed the victim. The former waives the spousal communication privilege; the latter does not.

**{44}** When interpreting the waiver rule set forth in Rule 11-511, we are mindful that the rule applies to evidentiary privileges other than the spousal privilege, including the lawyer-client privilege, *see* Rule 11-503 NMRA, and the physician-patient privilege, *see* Rule 11-504 NMRA. New Mexico cases discussing Rule 11-511 in these contexts provide further guidance and confirm that a person waives a confidential communication by disclosing the communication itself, but not by mere disclosure of the underlying facts or subject matter. *See Pincheira*, 2008-NMSC-049, ¶ 33 (observing that the communication privileges, including the physician-patient privilege, "are destroyed by any revelation of the *actual communications*" (emphasis added)); *see also State ex rel. State Highway Comm'n v. Steinkraus*, 1966-NMSC-134, ¶ 4, 76 N.M. 617, 417 P.2d 431 ("It is clear to us that the attorney-client privilege should only be applied to protect communications—not facts."); *Gingrich v. Sandia Corp.*, 2007-NMCA-101, ¶¶ 12-13, 142 N.M. 359, 165 P.3d 1135 (concluding that a client waived the attorney-client privilege for a report prepared by its attorney when the client disclosed the report to the opposing party and to third parties outside the litigation). These New Mexico cases are consistent with the federal approach to waiver.

**{45}** Under federal law, a disclosure to a third party waives the spousal communication privilege "if the spouse discloses *the statement*, but not if the spouse simply talks again about the same act, event, or condition that is the subject of the statement." 2 Mueller & Kirkpatrick, *supra*, § 5:40, at 756; *see, e.g., United States v. Lea*, 249 F.3d 632, 641-42 (7th Cir. 2001) (concluding that the defendant did not waive the spousal communication privilege for statements he made to his wife by making

statements to others that "dealt with a similar topic").  We conclude that, to waive a privilege under Rule 11-511, a person must disclose a significant part of the privileged communication.  This means that the person must disclose the actual privileged communication.  It is not enough to disclose the subject matter of the communication.  We return now to the case at hand.

**{46}**  The district court erred when it concluded that Gutierrez waived the spousal communication privilege by disclosing to third parties the subject matter of the confidential communications he shared with Nicole and Evelyn.  Such disclosure does not give rise to a waiver.  We proceed to evaluate whether Nicole's and Evelyn's testimony was otherwise admissible and, if not, what consequences flow from the district court's erroneous admission of the testimony.  We examine the testimony of each wife separately.

b.     *Nicole's testimony*

**{47}**  Nicole gave testimony about three communications between her and Gutierrez.  First, she testified that when she told Gutierrez her uncle had raped her, Gutierrez told her "not to worry about anything anymore."  Second, Nicole testified that, after Gutierrez committed the murder, he told her that he "took care of it" and needed help finding a shotgun shell.  Third, Nicole testified that Gutierrez threatened her life and warned her not to tell anyone what had happened.

**{48}**  We may summarily reject the assertion that Gutierrez's threat against Nicole's life is privileged.  "Verbal threats between spouses are not marital 'confidences' which the spousal privilege was intended to shield from courtroom disclosure.  Indeed, abusive language is not privileged since it is not warranted or induced by the marital relation." 81 Am. Jur. 2d *Witnesses* § 307 (2019) (footnote omitted); 98 C.J.S., *Witnesses*, § 323, at 293 (2013) (same).  Accordingly, we dedicate no further attention to the third communication—that communication was admissible.  We need only focus on the first and second communications.

**{49}**  The first and second communications between Nicole and Gutierrez were confidential, spousal communications.  Nevertheless, the State argues that even if the district court erred by permitting Nicole to testify about these statements, the spousal communication privilege did not preclude Nicole from testifying about her own observations and experiences.  We agree.

**{50}**  The spousal communication privilege applies only to "utterances or expressive acts intended by one spouse to convey a meaning or message to the other." *State v. Teel*, 1985-NMCA-115, ¶ 9, 103 N.M. 684, 712 P.2d 792.  "Observations by one spouse of the non-communicative acts of the other, especially acts which are open to the view of others, are not confidential communications." *Id.* ¶ 10.  "Generally, the defendant cannot invoke the marital communications privilege to prevent the spouse from testifying to what the witness-spouse saw." 3 Weinstein & Berger, *supra*, § 505.10[2], at 505-16 to -17.  For these reasons, Nicole's first-hand testimony was not privileged, and

this conclusion is significant. Her admissible testimony renders the district court's erroneous admission of the privileged testimony harmless.

**{51}** "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. The evidentiary error in this case was harmless if "there is no reasonable probability the error affected the verdict." *Id.* ¶ 36 (emphasis, internal quotation marks, and citation omitted). To determine the effect the error had on the verdict, "[w]e examine all the circumstances surrounding the error; examine the importance to the prosecution's case of the erroneously admitted evidence, and ask, among other things, whether the erroneously admitted evidence was cumulative or introduced new facts." *State v. Rivas*, 2017-NMSC-022, ¶ 52, 398 P.3d 299.

**{52}** Nicole testified that she saw the victim's corpse, participated in the attempt to gather the spent shotgun-shell casings, and could readily deduce (apart from any admissions made by Gutierrez) that Gutierrez did indeed kill the victim. The fact that Nicole was wrongly permitted to testify that Gutierrez told her "not to worry about anything anymore" and that he "took care of it" and needed help finding a shotgun shell was cumulative of other far more significant portions of her first-hand account of the events surrounding the victims's death.

**{53}** There is no reasonable probability that the erroneous admission of Gutierrez's confidential, spousal communications to Nicole affected the verdict. The improper admission of Gutierrez's statements to Nicole was harmless error.

*c.     Evelyn's testimony*

**{54}** The spousal communication privilege applied to Evelyn's testimony only if Gutierrez told her about the murder *during the marriage*. Rule 11-505(B); *State v. Lard*, 1974-NMCA-004, ¶¶ 10-12, 86 N.M. 71, 519 P.2d 307 (holding that the spousal privilege did not apply to a couple who lived together but was not married). At the evidentiary hearing, the parties disputed whether Gutierrez told Evelyn about the murder before or after their wedding. This factual dispute presented a preliminary question of fact for the district court to determine under Rule 11-104(A) NMRA. *See* 25 Wright & Graham, *supra*, § 5602, at 818 (explaining that the court determines a factual dispute about the existence of a valid marriage "like any other question of preliminary fact" under Rule 104 of the Federal Rules of Evidence).

**{55}** To enable the district court to make this determination, Gutierrez had to prove by a preponderance of the evidence that he married Evelyn before the communication was made. *See Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 13, 143 N.M. 215, 175 P.3d 309 ("The party claiming privilege has the burden of establishing that a communication is protected[.]"); *see also State v. Martinez*, 2007-NMSC-025, ¶ 19, 141 N.M. 713, 160 P.3d 894 (explaining that when determining the admissibility of evidence, the district court "need only be satisfied by a preponderance of the evidence that the foundational requirement has been met"). Based on the evidence Gutierrez introduced at the hearing, the district court was unable to determine whether

he and Evelyn were married when the statements were made. "[I]f the probabilities are equal there is no preponderance of evidence, [and] the burden of proof has not been sustained[.]" *Lopez v. Townsend*, 1938-NMSC-058, ¶ 49, 42 N.M. 601, 82 P.2d 921 (internal quotation marks and citation omitted). This point of law governs here.

**{56}** Because the district court could not resolve the issue, we conclude that Gutierrez failed to prove by a preponderance of the evidence that he and Evelyn were married at the time the statements were made. Accordingly, Gutierrez's statements to Evelyn were not privileged communications under Rule 11-505. We affirm the district court's admission of Evelyn's testimony under the right for any reason doctrine. *State v. Vargas*, 2008-NMSC-019, ¶ 8, 143 N.M. 692, 181 P.3d 684.

*d.    Conclusion: consequence of any evidentiary errors*

**{57}** The district court wrongly admitted confidential, spousal communications between Nicole and Gutierrez. Nevertheless, that error was harmless. The alleged confidential, spousal communications that Evelyn was permitted to testify about were not, in fact, privileged, spousal communications. There is no reason to reverse Gutierrez's convictions or grant him a new trial simply because some evidence was admitted in violation of the spousal communication privilege.

## B.    Sufficiency of the Evidence

**{58}** Gutierrez claims that his conviction is not supported by sufficient evidence. This claim is premised on the assertion that the spousal communication privilege precluded the admission of Nicole's and Evelyn's testimony. As we have explained, although the district court erred by admitting portions of Nicole's testimony, the district court properly admitted Nicole's testimony to the extent it was not privileged or was based on her own observations and experiences. Evelyn's testimony was admissible. The collective impact of the admissible testimony was quite damaging for Gutierrez.

**{59}** Nicole testified that she could deduce Gutierrez killed the victim regardless of any statements he made. Gutierrez brought her to the crime scene to help him locate the shotgun shells used in the murder. She saw the victim's body lying face down on the floor of the boxcar. She knew Gutierrez destroyed or concealed the clothes and shoes worn during the murder. She testified that she lied to police about Gutierrez's role in the killing because she was afraid of him. Evelyn testified that Gutierrez went to the victim's home and shot him in the face with a shotgun because the victim had molested Nicole earlier in her life. This evidence demonstrated that Gutierrez had a reason to kill the victim and did in fact kill him. Other evidence at trial corroborated Nicole's and Evelyn's testimony.

**{60}** Expert testimony indicated that the victim died as a result of being shot in the head with a shotgun fired at close or intermediate range. A crime scene investigator testified that the victim's boxcar was "in a shambles" and that it appeared that the body had been moved or rolled over prior to the arrival of police. Another police officer testified that, when he arrived at the scene, the boxcar looked like it had been

ransacked and was filthy, with overturned furniture and beer cans scattered around. The victim's body was face down on the floor, surrounded by clutter.

**{61}** We view the evidence as a whole and in the light most favorable to the State. *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198. Viewing the evidence in this manner, we conclude that the evidence was sufficient to support Gutierrez's conviction.

## C. Grand Jury Proceedings

**{62}** Prior to trial, Gutierrez moved to dismiss the indictment arguing that he did not receive timely notice of the grand jury proceedings as required by NMSA 1978, Section 31-6-11(C) (2003), and Rule 5-302A(A) NMRA (2010). At a motion hearing, the parties presented conflicting evidence about whether Gutierrez received timely notice. The district court found that Gutierrez received timely notice and denied his motion. On appeal, Gutierrez argues that the prosecution's failure to provide timely notice resulted in the violation of his right to testify before the grand jury.

**{63}** If the target of a grand jury investigation believes that there has been a violation of the grand jury statutes, the "target may file a motion to quash the indictment in the district court, apply for an interlocutory appeal, or file a petition for an extraordinary writ with this Court." *Herrera v. Sanchez*, 2014-NMSC-018, ¶ 10, 328 P.3d 1176. But a challenge to a grand jury indictment "should be raised before trial because a petit jury's finding at trial of guilt beyond a reasonable doubt typically will moot any post-conviction challenges to the grand jury's determination of probable cause." *Id.*; *see also State v. Bent*, 2012-NMSC-038, ¶ 1, 289 P.3d 1225.

**{64}** Gutierrez's argument that the State violated his right to testify before the grand jury is moot. The trial jury found him guilty beyond a reasonable doubt.

## D. Destruction of Evidence

**{65}** In a pretrial "motion to dismiss for suppression of evidence," Gutierrez alleged that the State lost the raw data from a polygraph examination of an early suspect, Ulysses Wilson, who allegedly had a motive to kill the victim. During the polygraph examination, Wilson denied shooting and killing the victim. The polygraph examiner reported that Wilson's responses were "deceptive" or false.

**{66}** The State disclosed the results of Wilson's polygraph examination to Gutierrez prior to trial. Although the State had the results of the examination, the associated charts and any recordings of the examination had been destroyed before Gutierrez was charged as a suspect in this case. The unavailability of the charts and recordings could have prevented Gutierrez from meeting the evidentiary prerequisites to the admission of the polygraph results at trial. *See Lee v. Martinez*, 2004-NMSC-027, ¶¶ 36-41, 136 N.M. 166, 96 P.3d 291 (describing prerequisites to the admissibility of polygraph results); *see also* Rule 11-707(C), (D) NMRA (same). To prevent prejudice to Gutierrez

and resolve his motion to dismiss, the State stipulated that Gutierrez could use the polygraph results as evidence at trial without objection.

**{67}** Despite the State's stipulation, Gutierrez renewed his motion to dismiss after learning that the State had retained an expert witness to testify about the reliability of the polygraph results. Gutierrez asked the district court to dismiss the case as a sanction for the State's loss of evidence or, alternatively, to exclude the testimony of the State's expert witness. The district court denied Gutierrez's motion, admitted the polygraph report into evidence at trial, and allowed the State's polygraph expert to testify.

**{68}** On appeal, Gutierrez claims that the district court erred by denying his motion to either dismiss the case or exclude the State's expert witness. Gutierrez also asserts that the district court failed to instruct the jury about the spoliation of evidence. We review the district court's rulings for abuse of discretion. *State v. Riggs*, 1992-NMSC-057, ¶ 10, 114 N.M. 358, 838 P.2d 975.

**{69}** District courts possess authority to impose sanctions on the State if the defendant has suffered prejudice as a result of the State's deliberate or bad faith loss of evidence. *See State v. Chouinard*, 1981-NMSC-096, ¶¶ 12-15, 96 N.M. 658, 634 P.2d 680. But the sanction of dismissal is extreme and may be "used only in exceptional cases." *State v. Harper*, 2011-NMSC-044, ¶¶ 16, 19, 150 N.M. 745, 266 P.3d 25 (internal quotation marks and citation omitted), *modified on other grounds by State v. Le Mier*, 2017-NMSC-017, 394 P.3d 959. In this case, nothing in the record suggests that the State's loss of evidence was deliberate or in bad faith, and Gutierrez suffered no prejudice because he was permitted to introduce the polygraph results as evidence at trial. Accordingly, the district court did not err by declining to dismiss the case as a sanction for the State's loss of evidence. We similarly conclude that the court did not err in rejecting Gutierrez's request to preclude the State's expert witness from testifying.

**{70}** In *Chouinard*, this Court explained that, if the State's loss of evidence is known prior to trial, the district court may choose between two alternative remedies: either (1) exclude "all evidence which the lost evidence might have impeached," or (2) allow admission of all of the evidence that the lost evidence would impeach "with full disclosure of the loss and its relevance and import." 1981-NMSC-096, ¶ 23. The district court's choice between these two alternatives depends on the court's "assessment of materiality and prejudice. The fundamental interest at stake is assurance that justice is done, both to the defendant and to the public." *Id.*

**{71}** In Gutierrez's case, the district court had two options: either (1) exclude the polygraph results and any associated evidence, or (2) admit the polygraph results and inform the jury that the associated charts and recordings had been lost, with full disclosure of the relevance and importance of the lost evidence. Gutierrez wanted to introduce the polygraph results, so the district court chose the second option. This remedy ensured that justice was done, both for Gutierrez and for the State. Gutierrez was permitted to use the polygraph results to argue that Wilson committed the murder, and the State was allowed to introduce expert testimony to assist the jury in evaluating

the reliability of the polygraph results. *See generally Lee*, 2004-NMSC-027, ¶¶ 4, 41, 48 (holding that although there are "a number of potential problems with polygraph results," the results of a polygraph examination conducted in accordance with Rule 11-707 may be admissible subject to "cross-examination, presentation of rebuttal evidence, and argumentation").

**{72}** Finally, Gutierrez's assertion that the district court failed to instruct the jury concerning the lost evidence lacks merit. The district court gave the following jury instruction at trial: "In this case certain evidence in the custody and control of the State of New Mexico was lost and is not available. The loss of this evidence means some material facts may be unknown. You must determine what weight should be given to the absence of this evidence." The record reflects that Gutierrez stipulated to this instruction. We affirm the district court's denial of Gutierrez's pretrial motion.

### E.     Ineffective Assistance of Counsel

**{73}** Gutierrez argues that he received ineffective assistance of counsel when defense counsel failed to meet the deadline for filing a witness list. Some discussion of the law governing witness disclosure and additional facts from Gutierrez's trial must be presented to make Gutierrez's argument comprehensible.

**{74}** Rule 5-502(A)(3) NMRA required Gutierrez to disclose his witness list to the State within thirty days after arraignment. Defense counsel filed a list of eleven potential witnesses well after this deadline, just two business days prior to jury selection. The State did not receive notice of Gutierrez's witness list until after jury selection was underway and moved to exclude Gutierrez's witnesses due to the untimely notice.

**{75}** At a hearing, defense counsel explained that he did not intend to call all eleven witnesses to testify at trial. Instead, he clarified that he had included eight of the eleven names for the sole purpose of reading the names to the jury panel during voir dire. The remaining three witnesses included (1) the custodian of records for the district court, (2) the custodian of evidence for the police department, and (3) Richard Silva.

**{76}** Through a proffer, defense counsel informed the district court that Silva had written a letter stating that Nicole told him that Gutierrez was not involved in the murder. Defense counsel equivocated about whether he would actually call Silva to testify at trial.

**{77}** The State stipulated that Gutierrez could call the custodian of records for the district court and custodian of evidence for the police department, but the State opposed Gutierrez calling Silva to testify at trial. The district court granted the State's motion to exclude Gutierrez's witnesses, subject to the State's stipulation. Gutierrez's position on appeal is that this ruling "gutt[ed] the entire defense case" and denied him a fair trial.

**{78}** "To establish ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799

(internal quotation marks and citation omitted). "Failure to prove either prong of the test defeats a claim of ineffective assistance of counsel." *State v. Guerra*, 2012-NMSC-027, ¶ 23, 284 P.3d 1076 (internal quotation marks and citation omitted). To demonstrate that counsel's performance was deficient, the defendant must show that defense "counsel's representation fell below an objective standard of reasonableness." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (internal quotation marks and citation omitted). To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* ¶ 27 (internal quotation marks and citation omitted).

**{79}** "When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record." *State v. Roybal*, 2002-NMSC-027, ¶ 19, 132 N.M. 657, 54 P.3d 61. If the defendant makes a prima facie case of ineffective assistance of counsel, this Court may remand the case to the district court for an evidentiary hearing. *Id.* But if the appellate record does not provide enough information to evaluate the merits of the claim, this Court generally prefers that the claim "be brought and resolved through habeas corpus proceedings." *State v. Bernal*, 2006-NMSC-050, ¶ 33, 140 N.M. 644, 146 P.3d 289.

**{80}** The record before us reflects that Silva was the only potential witness who was excluded by the district court's order. Moreover, defense counsel conceded that he was unsure whether he would actually call Silva to testify. Based on defense counsel's proffer, it appears that Silva lacked first-hand knowledge about this case. Therefore, the probative value of Silva's testimony would have been limited to impeaching Nicole's credibility. Defense counsel repeatedly challenged Nicole's credibility during cross-examination and, thus, Silva's testimony would have been cumulative of other evidence at trial. This conclusion is determinative.

**{81}** Gutierrez has not adequately articulated how Silva's testimony could have affected the outcome at trial and, therefore, we conclude that Gutierrez has not shown that he was prejudiced by the late filing of the witness list. Accordingly, we hold that Gutierrez has not presented a prima facie case of ineffective assistance of counsel. This conclusion does not preclude him from raising ineffective assistance of counsel in a petition for writ of habeas corpus. *See id.*

## III.    CONCLUSION

**{82}** We prospectively abolish the spousal communication privilege in New Mexico and withdraw Rule 11-505. This ruling affects all cases filed on or after the date this opinion is filed. Gutierrez's first-degree murder conviction is affirmed.

**{83}  IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

**PETRA JIMENEZ MAES, Justice, Retired**
**Sitting by designation**

**GARY L. CLINGMAN, Justice, Retired**
**Sitting by designation**

**BARBARA J. VIGIL, Justice, concurring in part, dissenting in part**

**CHARLES W. DANIELS, Justice, Retired, concurring in part, dissenting in part**
**Sitting by designation**

**VIGIL, Justice (concurring in part, dissenting in part).**

**{84}** I concur in the judgment affirming Defendant's conviction and agree with the Majority's conclusion on each of the issues Defendant has raised on appeal. I respectfully dissent from the Majority's decision to abolish the spousal communications privilege and to withdraw Rule 11-505 NMRA for two reasons. First, because it plays a significant role in protecting the privacy rights of married couples, I do not agree that the spousal communications privilege should be abolished. Second, regardless of my view that the privilege should remain intact, I do not believe the Majority is justified in abolishing the privilege by way of this precedential opinion. If the Majority is indeed concerned that the spousal communications privilege has outlived its utility in our justice system, then it should refer the matter to the Rules of Evidence Committee. The committee rulemaking process allows for a more transparent and comprehensive study of the implications of abolishing this longstanding rule of evidence. By avoiding this process and abolishing the spousal communications privilege by fiat in this opinion, the Majority has unnecessarily exercised its rulemaking authority. Accordingly, I respectfully dissent from the Majority's decision to abolish the spousal communications privilege in New Mexico.

## I.      THE SPOUSAL COMMUNICATIONS PRIVILEGE SHOULD NOT BE ABOLISHED

**{85}** The spousal communications privilege serves to protect the private conversations that occur within a marriage. *See* Rule 11-505. Marriage bridges several facets of the human experience. It is both a legal contract and a sentimental, and for some, religious, promise of fidelity and love. *See* NMSA 1978, § 40-1-1 (1862-63); NMSA 1978, § 40-1-2 (2013); NMSA 1978, § 40-1-3 (2013). As a legal status, marriage grants a couple myriad benefits and protections offered by the state and federal government. *See Griego v. Oliver*, 2014-NMSC-003, ¶¶ 6-7, 316 P.3d 865; *Obergefell v. Hodges*, 576 U.S. ___, 135 S.Ct. 2584, 2601 (2015). As a solemn vow of unity, marriage creates for many a sacred space to share oneself with a chosen other. That space should remain free from state intrusion and compulsion that would demand one spouse to reveal the intimate secrets of the other.

**{86}** While the Majority argues that the spousal communications privilege "has outlived its justifications," *Maj. Op.* ¶ 38, I contend that the privilege retains value in guarding the privacy of the marriage. I am not alone in my belief that the spousal communications privilege should remain a rule of evidence. With the Majority's decision in this case, New Mexico will be the only state in the nation that does not recognize any form of marital privilege. This gives me pause. The Majority's argument that the spousal communications privilege cannot be justified on privacy grounds without ignoring the private pain of domestic violence victims, *see Maj. Op.* ¶ 31, itself ignores that New Mexico has abrogated the spousal communications privilege in cases where one spouse is accused of inflicting harm on the other. *See* Rule 11-505(D)(1). For these reasons, I respectfully disagree with the Majority's decision to abolish the spousal communications privilege in New Mexico.

## A. Marriage Is a Cornerstone of Civil Society

**{87}** "No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice, and family." *Obergefell*, 135 S.Ct. at 2608. Marriage "fulfils yearnings for security, safe haven, and connection that express our common humanity." *Id.* at 2599 (internal quotation marks and citation omitted). Time and again, the United States Supreme Court has expressed its view of marriage as an institution to be held in the highest regard.

> Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. . . . [I]t is an association for as noble a purpose as any involved in our prior decisions.

*Id.* at 2599-2600 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)).

**{88}** Marriage is "the foundation of the family and of society, without which there would be neither civilization nor progress." *Id.* at 2601 (quoting *Maynard v. Hill*, 125 U.S. 190, 211 (1888)). A strong marital relationship supports children and binds families together. *See id.* at 2594; *Griego*, 2014-NMSC-003, ¶ 15 (describing the parties seeking to be legally married as having "formed stable family units involving mutual protection and support, and [who] together . . . have raised children . . . [and] cared for aging parents"); 25 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence*, § 5572, at 480 (1989) (explaining that strains on the marital relationship strain family relationships but strong marital relationships foster strong familial connections). Families, in turn, connect with numerous other esteemed societal institutions, such as schools, churches, work places, and ethnic groups. *See* 25 Wright & Graham, *supra*, § 5572, at 480-81. Our communities are strengthened by steadfast marriages, and marriages are strengthened when spouses are free to communicate with each other without fear of government intrusion into their confidential conversations. *See* Mark Reutlinger, *Policy, Privacy, and Prerogatives: A Critical*

*Examination of the Proposed Federal Rules of Evidence as They Affect Marital Privilege*, 61 Calif. L. Rev. 1353, 1371 (1973).

## B.    The Spousal Communications Privilege Protects the Privacy of the Marriage

**{89}**    The spousal communications privilege has ancient roots in English common law. *See* 25 Wright & Graham, *supra*, § 5572, at 467 (explaining that "the communications privilege was being enforced as early as the late 17th Century, thus making it the second oldest privilege for confidential communications"). Decades before statehood, the Territory of New Mexico adopted a privilege against disclosure of marital communications. 1880 N.M. Laws, ch. 12 § 7 ("No husband shall be compelled to disclose any communication made by his wife during the marriage, and no wife shall be compelled to disclose any communication made to her by her husband during the marriage."). This statutory privilege for marital communications has remained unchanged since 1880. NMSA 1978, § 38-6-6(A) (1973). Our court rules have contained a form of spousal privilege since 1973. NMSA 1953, § 20-4-505 (Repl. Vol. 1, 1973 Pocket Supp.); Rule 11-505. The 1973 court rule provided that a defendant had the privilege to bar his or her spouse from testifying in any capacity in the defendant's criminal trial. NMSA 1953, § 20-4-505 (Repl. Vol. 1, 1973 Pocket Supp.). The rule was amended in 1976 to provide a privilege against disclosure of confidential marital communications in court. Rule 11-505 Comm. commentary. In 1980, the complete testimonial bar was removed from the privilege, NMSA 1978, Rule 505 (Vol. 11, 1980 Supp.), leaving the spousal communications privilege as we know it today. Rule 11-505.

**{90}**    While the Majority suggests that the long history of the spousal communications privilege "should be a source of scorn rather than admiration" and cites critics who would label the privilege a "sentimental relic . . . [that is] patently incompatible with" our modern lives, *Maj. Op.* ¶ 29, other scholars have argued that the privilege's longevity demonstrates that it "must encapsulate some basic human values[,]" allowing it "to survive despite all of the rationalistic attacks that have been made . . . and the many changes in the surrounding legal culture that have occurred over the centuries." 25 Wright & Graham, *supra*, § 5572, at 466.

**{91}**    I am convinced that the durability of the spousal communications privilege is tied to our society's view that marriage is sacrosanct and should be guarded from excessive state intrusion. "In a liberal democracy, the spousal relationship is deemed one of the most sacred. In a democratic society, it is particularly abhorrent and repugnant for government to intrude upon the privacy of that relationship." 1 Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence*, § 6.2.1, at 509 (2d ed. 2010). The Majority acknowledges the moral repugnance in forcing one spouse to divulge the secrets of the other, yet casts aside the humanistic and privacy rationales for the privilege as "soaring rhetoric and legally irrelevant sentimentality." *Maj. Op.* ¶¶ 17, 32. I respectfully disagree. The want to safeguard marital privacy is not a legally insignificant appeal to sentimentality.

**{92}** As noted, marriage has a substantial impact on our society and is widely considered to create one of the most important relationships in life. *See* Section IA, *supra*. According to the 2010 census data, husband and wife families comprised roughly 45% of total households in New Mexico. U.S. Census Bureau, U.S. Dep't of Commerce, *2010 Census of Population and Housing: Summary Population and Housing Characteristics*, 7 tbl.4 (2013), https://www.census.gov/prod/cen2010/cph-1-1.pdf. Presumably, this wide swath of the state's population has strong feelings about the private matters they share with their spouses. In a democracy, far-reaching public sentiment deserves substantial consideration in the imposition of public laws and rules. *See* The Federalist No. 57, at 350 (James Madison) (Clinton Rossiter ed., 2003) (explaining that "human policy" is best guided by a "sympathy of sentiments" between lawmakers and their constituents). We cannot ignore the humanistic rationale for the spousal communications privilege simply because the marital relationship takes root in notions of love and commitment. There is inherent value in protecting the private conversations between spouses from compulsory disclosure in our courts.

**{93}** It is the "intrinsically private character" of a marriage and the "reciprocal indecency of invading that privacy" that justifies the spousal communications privilege under a humanistic rationale. *See* Charles L. Black, Jr., *The Marital and Physician Privileges–A Reprint of a Letter to a Congressman*, 1975 Duke L.J. 45, 49. The marital promise–both legal and emotional–to support and love one another creates a relationship "as impervious to state control as we suppose our innermost thoughts are." *See* 25 Wright & Graham, *supra*, §5572, at 479. Eliminating the spousal communications privilege spells "nearly complete destruction of the privacy of marriage, in the interest of the conduct of ordinary litigation." *See* Black, *supra*, at 48. Absent the spousal communications privilege, a testifying spouse must either disclose the intimate, private, and perhaps embarrassing secrets of the other spouse or risk being held in contempt of court. *See id.* (explaining that forcing a testifying spouse into this quandary may easily lead "any decent person . . . either to lie or to go to jail."). In weighing the equities of the judicial pursuit of truth and the freedom of married couples to share confidences absent government interference, I must conclude that marital privacy is more valuable than the collection of evidence in a given case.

## C. Marital Privileges Are Universally Recognized Across the United States

**{94}** Following the Majority's opinion today, New Mexico will be the only state in the United States without some form of marital privilege.[1] Marital privileges are also

---

[1]*See* Ala. R. Evid. 504; Alaska R. Evid. 505(b); Ariz. Rev. Stat. Ann. § 12-2232 (2010); Ark. R. Evid. 504; Cal. Evid. Code §§ 970-971 (1965); Colo. Rev. Stat. § 13-90-107(1)(a)(I) (2017); Conn. Gen. Stat. §§ 54-84a, -84b (2011); Del. R. Evid. 504; D.C. Code § 14-306 (2009); Fla. Stat. § 90.504 (1978); Ga. Code Ann. §§ 24-5-501(a)(1), -503 (2011, as amended through 2014); Haw. Rev. Stat. § 626-1, Rule 505 (1980); Idaho R. Evid. 504; 725 Ill. Comp. Stat. 5/115-16 (2013); Ind. Code § 34-46-3-1(4) (1998); Iowa Code. § 622.9 (2019); Kan. Stat. Ann.§ 60-428 (1965); Ky. R. Evid. 504; La. Code Evid. Ann. art. 504 (1992); Me. Stat. tit. 15, § 1315 (1969); Md. Code Ann. Cts. & Jud. Proc. § 9-105 (1973); Mass. R. Evid. 504; Mich. Comp. Laws § 600.2162 (2001); Minn. Stat. § 595.02(1)(a) (2013); Miss. R. Evid. 504; Mo. Rev. Stat. § 546.260 (1985); Mont. Code Ann. § 26-1-802 (2005); Neb. Rev. Stat. § 27-505 (1984); Nev. Rev. Stat. § 49.295 (2017); N.H. R. Evid. 504; N.J. Stat. Ann. § 2A:84A-17(2) (2007); N.Y. Evid. Law §

recognized by the Navajo Nation, Guam, Puerto Rico, and the U.S. Virgin Islands. Navajo R. Evid. 13(3); Guam R. Evid. 504(d), (e); 32A L.P.R.A. App. IV, Rule 27 (1979); V.I. Code Ann. tit. 5, § 854 (2012). Lastly, federal common law recognizes the spousal communications privilege. *See Trammel v. United States*, 445 U.S. 40, 51 (1980); *Blau v. United States*, 340 U.S. 332, 333 (1951); *Wolfle v. United States*, 291 U.S. 7, 14 (1934); *United States v. Breton*, 740 F.3d 1, 9-10 (1st Cir. 2014); *United States v. 281 Syosset Woodbury Road*, 71 F.3d 1067, 1070 (2d Cir. 1995); *United States v. Hill*, 967 F.2d 902, 911 (3d Cir. 1992); *United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987); *United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980); *United States v. Sims*, 755 F.2d 1239, 1241 (6th Cir. 1985); *United States v. Lea*, 249 F.3d 632, 641 (7th Cir. 2001); *United States v. Jackson*, 939 F.2d 625, 627 (8th Cir. 1991); *United States v. Fomichev*, 899 F.3d 766, 771 (9th Cir. 2018); *United States v. Bahe*, 128 F.3d 1440, 1441-42 (10th Cir. 1997); *United States v. Singleton*, 260 F.3d 1295, 1297-98 (11th Cir. 2001); *S.E.C. v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997). The Majority's decision to abolish the spousal communications privilege represents a drastic departure from the practice in other jurisdictions. Following this decision, New Mexico will stand alone in its refusal to offer protection for confidential marital communications in its courts. The broad support across the country for the spousal privileges emphasizes the importance of protecting a basic privacy right of married couples, one that should not be abandoned by the Majority.

### D.     New Mexico's Spousal Communications Privilege Does Not Apply in Domestic Violence Cases

**{95}**     The Majority argues that the spousal communications privilege shields the family from state interference, allowing the justice system to turn a blind eye to private violence against women because the victims are unable to testify against their abusive spouses. *Maj. Op.* ¶ 31. I am sensitive to this concern but am confident that New Mexico's spousal communications privilege adequately protects victims of domestic violence. The Majority's argument conflates the spousal communications privilege with spousal immunity.

**{96}**     Spousal immunity bars spouses from testifying against each other and is not recognized in New Mexico. *See* Malinda L. Seymore, *Isn't it a Crime: Feminist Perspectives on Spousal Immunity and Spousal Violence*, 90 Nw. U. L. Rev. 1032, 1045 (1995-96) ("Spousal immunity works as a complete bar to testimony, regardless of the subject matter of the testimony."). In contrast, the spousal communications privilege allows one spouse to take the stand but prevents him or her from disclosing what the other spouse said in confidence. Rule 11-505; *see* Seymore, *supra*, at 1046. In New Mexico, the privilege does not apply when one spouse is charged with a crime against

4502 (McKinney 1962); N.C. Gen. Stat. § 8-57(c) (2013); N.D. R. Evid. 504; Ohio Evid. R. 601(B); Okla. Stat. tit. 12, § 2504 (2002); Or. Rev. Stat. § 40.255 (2016); 42 Pa. Cons. Stat. §§ 5914, -5923 (1978); 9 R.I. Gen. Laws § 9-17-13 (2010); S.C. Code Ann. § 19-11-30 (2012); S.D. Codified Laws § 19-19-504 (1979); Tenn. Code Ann. § 24-1-201 (2000); Tex. R. Evid. 504; Utah Const. Art. I, § 12, Utah Code Ann. § 77-1-6(2)(d) (1980), Utah R. Evid. 502; Vt. R. Evid. 504, Vt. Stat. Ann. tit. 12, § 1605 (1947); Va. Code. Ann. §§ 8.01-398, 19.2-271.2 (2005); Wash. Rev. Code § 5.60.060 (2019); W. Va. Code §§ 57-3-3 to -4 (1919); Wis. Stat. § 905.05 (2009); Wyo. Stat. Ann. § 1-12-104 (1977).

the other spouse or the children of either spouse. Rule 11-505(D)(1)(a). Thus, the spousal communications privilege would not block the testimony of an abused spouse in a domestic violence case, even if that testimony disclosed confidential marital communications. I share the Majority's concern for victims of domestic violence but find that this concern is adequately addressed in the exceptions to the privilege articulated in Rule 11-505(D) and therefore cannot support abolishing the spousal communications privilege in its entirety.

## II. THE SPOUSAL COMMUNICATIONS PRIVILEGE SHOULD NOT BE ABOLISHED BY FIAT IN THIS OPINION

**{97}** To abolish the spousal communications privilege in this opinion is imprudent for three reasons. First, the parties did not raise the issue for our review. Second, the continued viability of the spousal communications privilege is not determinative of the Court's conclusion affirming Defendant's convictions. Finally, the more sensible method to determine whether to abolish the spousal communications privilege is to refer the matter to the Rules of Evidence Committee for further study and recommendation to this Court.

### A. Issue Not Raised by the Parties

**{98}** The issue of whether to abolish the spousal communications privilege is not before the Court. Neither party to this case asked the Court to assess whether the spousal communications privilege should be abolished in New Mexico. The question on appeal was whether the district court erred in concluding that Defendant had *waived* the spousal communications privilege. *Maj. Op.* ¶ 40. The parties briefed the issue of waiver. Then, the Court ordered the parties to provide supplemental briefing on the question of whether the spousal communications privilege should be modified or abolished. The Court also accepted an amicus brief on this issue from the New Mexico Criminal Defense Lawyers Association. In none of the supplemental briefing did the parties or amicus request that the spousal communications privilege be abandoned in its entirety. Given that no party has advocated the abolishment of the spousal communications privilege, the Majority fails to justify its basis for proceeding to do so here.

**{99}** The Court has the power to decide matters of law that were not raised by the parties in three discrete circumstances: (1) to resolve questions of jurisdiction, (2) to answer "questions of a general public nature affecting the interest of the state at large[,]" and (3) "to protect the fundamental rights of the parties." *State v. Jade G.*, 2007-NMSC-010, ¶ 24, 141 N.M. 284, 154 P.3d 659. None of these are present in this case. The first and third circumstances are clearly not met. There are no questions of jurisdiction, and Defendant's fundamental rights are not implicated by the Majority's prospective abolishment of the spousal communications privilege.

**{100}** In regard to the second circumstance, whether to abolish the spousal communications privilege is not a question of a general public nature that requires the Court to reach out and give an answer without having been asked to do so by the

parties. Recently, the Court has addressed a number of criminal justice questions not raised by the parties in an effort to clarify confusion on legal matters of general interest to the state. *See Fry v. Lopez*, 2019-NMSC-___, ¶¶ 79-81, ___ P.3d ___ (No. 34386, June 28, 2019) (modifying precedent to clarify the comparative proportionality analysis for death sentences under NMSA 1978, § 31-20A-4(C)(4)); *State v. Lewis*, 2019-NMSC-001, ¶ 21, 433 P.3d 276 (explaining that the Court addressed sua sponte the order in which the jury returns its verdicts because the pertinent uniform jury instructions were ambiguous and inconsistent); *State v. Consaul*, 2014-NMSC-030, ¶ 28, 332 P.3d 850 (admitting that this Court's case law "has not been a model of clarity" in defining criminal negligence and using the "potential for jury confusion" as partial justification for addressing the issue sua sponte). Unlike the case before us, these cases presented questions arising from preexisting legal ambiguity and admittedly opaque precedent, none of which exists here. There is no evidence demonstrating that the spousal communications privilege has been consistently misunderstood or misapplied in our state. Whether New Mexico courts should continue to recognize the spousal communications privilege does not pose a question we must answer here in order to dispel widespread confusion or clarify precedent. Because the circumstances of this appeal do not support consideration of a question not raised by the parties, it is imprudent for the Majority to abolish the spousal communications privilege sua sponte.

**B.      Abolishing the Spousal Communications Privilege Is Not Determinative of the Court's Conclusion in this Case**

**{101}** Affirmance of Defendant's convictions is not dependent upon elimination of the spousal communications privilege. Application of the privilege to Defendant's case still results in his proper conviction, a result in which I concur. As the Majority explains, portions of Nicole's testimony violated the spousal communications privilege, but the admission of those statements was harmless error. *Maj. Op.* ¶¶ 52-53. Because Defendant failed to prove that Evelyn was his wife at the time he made statements to her about the murder, Evelyn's testimony did not implicate the spousal communications privilege and was properly admitted. *Maj. Op.* ¶ 56.

**{102}** In weighing the justifications and criticisms of the spousal communications privilege, the Majority points to Defendant's invocation of the privilege to support its conclusion that it should be abolished. *Maj. Op.* ¶¶ 33-37. The Majority uses Defendant's relationships with his wives to illustrate that the spousal communications privilege does not advance marital harmony. *Maj. Op.* ¶ 37. Defendant's fraught marriages should not serve as proxies for every marriage in New Mexico. The old adage that "bad facts make bad law" springs to mind. But in this case, the facts do not necessitate any conclusion of law on the viability of the spousal communications privilege. These bad facts do not have to make bad law. In my opinion, the Majority has needlessly overreached in abolishing the spousal communications privilege in this case when Defendant's convictions are affirmed under proper application of the privilege.

**C.      Referral to the Rules of Evidence Committee**

**{103}** The Majority correctly notes that the Court has ultimate authority over questions of practice and procedure. *Maj. Op.* ¶ 9. While that is true, we must be prudent in exercising our authority. This is why we have a rulemaking process and a system of committees to advise the Court. *See* Rules 23-106 to -106.1 NMRA. There is no reason not to refer this matter to the Rules of Evidence Committee to address the Majority's concerns, study the issue, and make a recommendation to the Court. Following public comment and input from members of the bar, the committee's recommendation would have aided the Court in considering the broad implications of abolishing the privilege on our system of justice. This is especially so considering that New Mexico is the first and only state in the nation to eradicate the spousal communications privilege. I am concerned that the Majority reached this significant decision without employing the system in place to aid the Court in exercising its rulemaking authority.

## III.    CONCLUSION

**{104}** Respectfully, I cannot in good faith join the Majority in abolishing the spousal communications privilege. The sacred bond of marriage forms the foundation for personal happiness and is the bedrock of our civilized society. The spousal communications privilege protects that bond. Given the historical significance of marriage and the indecency of forcing one spouse to reveal the confidences of the other, I am not convinced that the privilege must be abolished in toto. Perhaps more troubling to my mind is the Majority's decision to do so in this manner. We must be mindful of the process by which we pronounce significant changes in the law. I cannot agree to eradicating such an important rule of evidence without, at a minimum, subjecting that decision to the rigorous review of our invaluable rulemaking process. Such review would result in a more robust and transparent examination of the merits of the spousal communications privilege in the administration of justice. For these reasons, while I concur in the part of the Majority opinion affirming Defendant's convictions on the issues raised on appeal, I must respectfully dissent from the Majority's decision to abolish the spousal communications privilege and to do so by way of this precedential opinion.

**BARBARA J. VIGIL, Justice**

**DANIELS, Justice (concurring in part, dissenting in part).**

**{105}** I write in brevity for two reasons. One is that few additional words are needed. The other is that I have few words left for my beloved Court and beloved colleagues.

**{106}** I concur fully with the views expressed in the opinions of my colleagues affirming Defendant's convictions. I share the views of the majority, views that I have held for a long time as a courtroom lawyer, as an evidence professor, and as a jurist, with regard to considering abolition or severe evisceration of the husband-wife communication privilege. That privilege obstructs the truth-seeking mission of our courts in order to protect criminals and other law-evaders and tort-feasors from being held responsible for their unlawful actions. And all this to hold sacred the marriage of Bonnie and Clyde?

**{107}** But I must agree with Justice Vigil one last time. Her preference is that a change to an evidence rule, particularly a significant change unnecessary to a dispositive outcome in litigation before us, should be handled through our established rules process, with input from the rules committee, with input from the larger legal community, and with input from the state we serve.

**{108}** With my profound respect for my colleagues who view the issue otherwise, I therefore dissent solely from using this appellate opinion to lay aside the regrettable marital communication privilege.

**CHARLES W. DANIELS, Justice, Retired**
**Sitting by designation**

## ORDER ON REHEARING

**VIGIL, Chief Justice.**

**{109}** This Court filed the original opinion in this case on August 30, 2019. That opinion affirmed Defendant's conviction for willful, deliberate, and premediated first-degree murder and also abolished the spousal communications privilege contained in Rule 11-505 NMRA. *See* paragraphs 39, 82, *supra*. Defendant thereupon filed a motion for rehearing pursuant to Rule 12-404 NMRA, which was supported by briefs of amici curiae. We granted the motion on the singular basis that "[t]he Court should hear the opinions [of] civil litigants and other jurists before the wholesale abolition of an established privilege," and we withdrew the order dated December 31, 2018, designating retired Justices Petra Jimenez Maes and Gary L. Clingman to participate in this case. (It was unnecessary to withdraw the designation of retired Justice Charles W. Daniels who had passed away in the meantime.) Justice Nakamura, then Chief Justice, dissented. We further ordered that the State was granted leave to file a brief to address the issue on rehearing, including a response to the amicus briefs, and that upon the filing of the State's brief, "this matter shall be submitted by the Clerk to the sitting Justices of this Court for final resolution."

**{110}** With this order we hereby retract the ruling in the original majority opinion that abolished the spousal communications privilege contained in Rule 11-505. *See* paragraphs 9-39, 82, *supra*. The spousal communications privilege contained in Rule 11-505 is hereby reinstated for all cases pending or filed as of the date of our order granting rehearing in this case, June 26, 2020. The remaining portions of the original majority opinion, applying Rule 11-505 to Defendant's case and affirming Defendant's conviction of first-degree murder, paragraphs 40-81, *supra*, shall stand.

**{111}** We determine that whether the spousal communications privilege contained in Rule 11-505 should be modified or abolished in New Mexico should be the subject of comprehensive study and robust public discussion. Accordingly, we refer to the Rules of Evidence Committee the matter of whether Rule 11-505 should be amended or abolished or should remain unchanged, and we ask the committee to submit its recommendation to this Court pursuant to Rules 23-106 and -106.1 NMRA. *See*

paragraph 103, *supra* (Vigil, J., concurring in part, dissenting in part). In conducting the review of this matter, we further instruct the Rules of Evidence Committee to consider the views and reasoning expressed by the Justices in the original majority opinion, paragraphs 1-81, *supra*, as well as the partial concurring and dissenting opinions, paragraphs 84-108, *supra*.

**{112}** In addition, we write today to clarify our interpretation and application of the rule governing motions for rehearing in this Court, Rule 12-404(B)(1) NMRA. That rule provides,

> Rehearing in the Supreme Court may be granted on the request of any three justices. Any justice or acting justice may participate in a rehearing or consideration of a motion for rehearing irrespective of whether the justice participated in the decision or was a member of the court at the time the decision was filed.

By its plain language, Rule 12-404(B)(1) permits any sitting Justice of the Court to vote on a motion for rehearing, regardless of whether the sitting Justice was a member of the panel at the time the opinion was filed. When the motion for rehearing was filed in this case on September 15, 2019, the five sitting Justices were all qualified under the New Mexico Constitution and the Rules of Appellate Procedure to rule on Defendant's motion for rehearing. As a result, the Court withdrew the designation order in this case.

**{113}** Upon review following our grant of Defendant's motion for rehearing, we hereby retract the ruling in the original majority opinion abolishing the spousal communications privilege. We reinstate Rule 11-505 in our Rules of Evidence and direct the Rules of Evidence Committee to evaluate the spousal communications privilege and submit to this Court the committee's recommendation on the future of the spousal communications privilege in this state's judicial system.

**{114} IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Chief Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**

**NAKAMURA, Justice, dissenting.**

**{115}** I am saddened by the Court's reinstatement of the spousal privilege, an evidentiary rule whose legacy is the silencing of women and the hindrance of truth seeking. *See* paragraphs 10-12, 29-32, *supra*.

**{116}** I also disagree with the Court's grant of rehearing on a prudential issue. Rule 12-404(A) provides for rehearing where the movant alleges that the Court has misapprehended an issue of law or fact or has relied upon an argument not briefed by the parties. Here, the Court takes up rehearing in order to refer the spousal privilege, Rule 11-505, to the Rules of Evidence Committee for recommendations as to its retention. A majority of Justices previously considered and rejected this course for good reason. This Court has ultimate rulemaking authority regarding rules of evidence and procedure in New Mexico courts. *See* paragraph 9, *supra*; Rule 11-501 NMRA. Rules Committees are creatures of this Court; they serve in the Court's discretion. Rule 23-106 NMRA. Thus, when a majority of this Court holds an existing court-created rule to be unsound or unjust, it does not preserve the rule and wait for a committee of the Court's own creation to supply recommendations. *See*, *e.g.*, *State v. Pieri*, 2009-NMSC-019, ¶ 33, 146 N.M. 155, 207 P.3d 1132 (overruling *Eller v. State*, 1978-NMSC-064, 94 N.M. 52, 582 P.2d 824, and amending Rule 5-304(D) NMRA to state a new rule regarding the sentencing information given to criminal defendants). Here, the Court has a duty to abolish an evidentiary rule that undermines the pursuit of truth and has outlived any persuasive justifications for its retention. *See* paragraph 38, *supra*.

**{117}** Furthermore, while I agree that Section 12-404(B)(1) permits a Justice who did not participate in a prior decision to participate in rehearing, I disagree with the Rule's use here. Three Justices who did not participate in rendering the original opinion relied on Rule 12-404(B)(1) to participate in rehearing, and—together with one of the original dissenting Justices—withdrew the order appointing those who participated and concurred in the Court's original opinion. I fear that granting rehearing through this process incentivizes litigants to seek rehearing whenever the Court's decision is split and a change in the members of the Court is imminent. *See Flaska v. State*, 1946-NMSC-035, ¶ 73, 51 N.M. 13, 177 P.2d 174 ("It would be mischievous in a high degree to permit the re-opening of controversies every time a new judge takes his place in the court, thereby encouraging speculation as to the probable effect of such changes upon principles previously declared and enforced in decided cases.") (quoting the Supreme Court of Michigan) (internal quotation marks and citation omitted). This in turn generates mistrust and a lamentable uncertainty and unpredictability in our law. *See Romero v. Byers*, 1994-NMSC-031, ¶ 12, 117 N.M. 422, 872 P.2d 840 (recognizing "the values of uniformity, predictability, and stability in the law").

**{118}** For the foregoing reasons, I respectfully dissent.

**JUDITH K. NAKAMURA, Justice**