The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: March 27, 2025

**NO. S-1-SC-39989**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CRAIG TALBERT SMITH,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Mark A. Peralta-Silva, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Eric J. Orona, Assistant Solicitor General
Santa Fe, NM

for Appellee

**OPINION**

**THOMSON, Chief Justice.**

**I.    INTRODUCTION**

{1}    Defendant Craig Talbert Smith challenges his convictions for first degree murder (willful and deliberate), conspiracy to commit first degree murder, kidnapping, aggravated burglary, and tampering with evidence. Defendant raises three issues for our review: (1) Did the district court abuse its discretion in denying Defendant's two motions for mistrial when a juror became ill during deliberations? (2) Is Defendant's conviction for conspiracy to commit first degree murder supported by sufficient evidence? and (3) Was Defendant's counsel ineffective because she was appointed approximately three months prior to trial?

{2}    We determine that the district court did not abuse its discretion in denying Defendant's motions for mistrial and that Defendant's conspiracy conviction is supported by sufficient evidence. We further conclude that Defendant has not shown ineffective assistance of counsel. We therefore affirm Defendant's conviction and sentence.

## II.    DISCUSSION

### A.    Denial of Defendant's Motions for Mistrial

{3}    As his first issue on appeal, Defendant challenges the district court's denial of his two motions for mistrial. Defendant's trial spanned from October 26, 2022, to November 9, 2022. At that time, this Court had implemented public health emergency protocols designed to minimize the spread and impact of the COVID-19 pandemic. *See* New Mexico Judiciary Public Health Emergency Protocols, Supreme Court Ord. No. 20-8500-025 (July 6, 2020, as amended by Supreme Court Ord. No. 22-8500-010 (eff. March 21, 2022)). Protocol 1(B), Health Screening and Self-Isolation Procedures, prohibited individuals who could not pass a series of health screening questions from entering the courthouse. *Id.*

{4}    Defendant's trial proceeded for six and one-half days in compliance with the protocols, and the case was submitted to the jury in the early afternoon of November 2, 2022. The next morning, a juror reported that she was sick with a fever. In accordance with court protocols, because the juror could not pass the screening questions, she was prohibited from entering the courthouse. The district court explored a variety of options with the parties in view of the juror's unavailability, including proceeding with eleven jurors, resuming deliberations with the sick juror attending via telecommunications, or recessing deliberations until the juror

recovered and was allowed to reenter the courthouse. Defendant objected to the alternatives proposed by the district court and moved for a mistrial; the State opposed. After considering the parties' positions, the district court denied Defendant's first motion for mistrial and suspended deliberations for one week, until November 9, 2022. The court indicated that it would reassess whether deliberations could resume on that date.

{5}     By November 9, the juror had recovered and was permitted to return to the courthouse. However, two other jurors reported having been exposed to family members who had tested positive for COVID-19, and accordingly the two could not pass the health screening questions for courthouse access. Defendant made a second motion for mistrial; the State opposed and suggested the district court seek an exemption from the public health emergency protocols. The district court subsequently asked this Court for an exemption, proposing to implement other health-protective measures that would allow the jurors to resume deliberations. This Court granted the exemption, and jury deliberations resumed around 1 p.m. on November 9. Just over an hour later, the jury returned a verdict.

{6}     Defendant contends that the district court erred in denying his two motions for mistrial and instead suspending deliberations. We review the district court's denial of a motion for mistrial for an abuse of discretion. *State v. Sena*, 2020-NMSC-

011, ¶ 15, 470 P.3d 227. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Sanchez*, 2020-NMSC-017, ¶ 21, 476 P.3d 889 (internal quotation marks and citation omitted). "A court abuses its discretion if it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *State v. Fernandez*, 2023-NMSC-005, ¶ 8, 528 P.3d 621 (internal quotation marks and citation omitted). "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted); *see also State v. Layne*, 2008-NMCA-103, ¶ 7, 144 N.M. 574, 189 P.3d 707 ("The very essence of discretion is that there will be reasons for the district court to rule either way on an issue, and whatever way the district court rules will not be an abuse of discretion.").

{7} When reviewing the district court's decision on a motion for mistrial, we are mindful that "[t]he trial judge is in a much better position to know whether a miscarriage of justice has taken place and his opinion is entitled to great weight in the absence of a clearly erroneous decision." *State v. Sutphin*, 1988-NMSC-031, ¶ 18, 107 N.M. 126, 753 P.2d 1314 (internal quotation marks and citation omitted). "The power to declare a mistrial should be exercised with the greatest caution." *State*

4

*v. Smith*, 2016-NMSC-007, ¶ 69, 367 P.3d 420 (internal quotation marks and citation omitted). A district court therefore should explore reasonable alternatives before declaring a mistrial. *State v. Messier*, 1984-NMCA-085, ¶ 14, 101 N.M. 582, 686 P.2d 272; *see also State v. Vanderdussen*, 2018-NMCA-041, ¶ 17, 420 P.3d 609 ("[T]he proposed alternatives to a mistrial must be feasible or reasonable."). In some circumstances, a juror's illness or unavailability may support declaration of a mistrial. *See Messier*, 1984-NMCA-085, ¶¶ 11-12 ("Manifest necessity for the declaration of a mistrial has been upheld . . . under certain circumstances where a judge, juror or witness has become ill or unavailable."); *State v. Salazar*, 1997-NMCA-088, ¶¶ 8, 17, 124 N.M. 23, 946 P.2d 227 (affirming that manifest necessity supported the declaration of a mistrial when a juror became unavailable due to a migraine). Yet in other circumstances, declaring a mistrial may seem an unnecessary waste of time and resources, and a reasonable continuance may be warranted. *See Messier*, 1984-NMCA-085, ¶ 14 ("Where a reasonable continuance may resolve the problem, it should be undertaken in lieu of granting a mistrial."); *see also State v. Sanchez*, 2000-NMSC-021, ¶ 9, 129 N.M. 284, 6 P.3d 486 ("When a juror becomes disabled during deliberations, . . . the trial court has limited options. Granting a mistrial may seem an unnecessary waste of scarce resources. Granting a continuance may be impractical.").

{8} We review each of Defendant's two motions for mistrial under this abuse of discretion standard of review.

**1.    Defendant's first motion for mistrial**

{9} Defendant contends that the district court abused its discretion in denying his first motion for mistrial because the court's decision to suspend deliberations violated his right to a fair trial. Defendant asserts that deliberations are a critical point in trial and that he was prejudiced by the suspension during jury deliberations. We agree that deliberations are critical; but, under the circumstances presented, we conclude the district court had good cause to grant a continuance. As the matter had already been submitted when the juror became ill, the district court could not substitute that juror with an alternate. *See* Rule 5-605(B) NMRA ("Alternate jurors . . . shall replace jurors who, *prior to the time the jury retires to consider its verdict*, become or are found to be unable or disqualified to perform their duties." (emphasis added)); *Sanchez*, 2000-NMSC-021, ¶ 23 (holding that post-submission substitution of a juror is reversible error under Rule 5-605(B) unless the state can show "that the trial court took adequate steps to ensure the integrity of the jury process"). The district court proposed reasonable alternatives that may have allowed the jurors to resume deliberations despite the juror's illness, which Defendant rejected. Now on appeal, Defendant concedes that there was no alternative to mistrial that he would

have accepted. The district court therefore did not err in concluding that a continuance was warranted.

{10}    We likewise conclude that the recess in deliberations did not prejudice Defendant. Defendant argues that he was prejudiced because his case was relatively complex and seven days was a lengthy suspension during which the jurors' memories of the evidence could have been affected. We disagree with Defendant's characterization of the complexity of his case and the length of the suspension. Even though presentation of evidence lasted six days, Defendant's trial was relatively straightforward as the State primarily relied on a few key witnesses and exhibits connecting Defendant to the crime. And seven days was not a long interruption in view of the fact that the trial took place in the midst of a global pandemic that disrupted many aspects of everyday life, including jurors' access to the courthouse. *Cf. Smith*, 2016-NMSC-007, ¶ 71 (concluding that a district court did not abuse its discretion in denying a motion for mistrial and instead ordering a midtrial recess of ten days to benefit the defense). Thus, we do not believe that either the complexity of the case or the length of the recess prejudiced Defendant in his trial.

{11}    Defendant also suggests that the jury could have been exposed to prejudicial media coverage during the recess in deliberations, noting that several news organizations reported on his trial. But we do not see any prejudice arising from the

7

jury's exposure to publicity under the circumstances presented. Generally, when it appears that jurors may have been exposed to inherently prejudicial publicity mid-trial, we require the district court to canvass the jury to determine whether any juror has been actually exposed to the publicity, and if so, to evaluate whether this exposure compromises the fairness of the trial. *See State v. Holly*, 2009-NMSC-004, ¶¶ 19-24, 145 N.M. 513, 201 P.3d 844; *see also State v. House*, 1999-NMSC-014, ¶¶ 25-26, 57, 127 N.M. 151, 978 P.2d 967 (recognizing the right to an impartial jury in the context of assessing a motion for change in venue due to pretrial publicity). Here, before the recess in deliberations, Defendant expressed concerns that the jury could be exposed to prejudicial publicity during the break. The district court indicated that it would be amenable to canvassing the jury on return from the recess. However, Defendant did not raise the issue again before deliberations resumed. We view Defendant's silence as a tacit admission that the jury was not actually exposed to prejudicial publicity during the break. *Cf. State v. Astorga*, 2015-NMSC-007, ¶ 70, 343 P.3d 1245 (concluding that a defendant "tacitly agree[d] that there was no evidence of actual prejudice" from exposure to pretrial publicity where the defendant did not renew a motion for change of venue after voir dire). Further, we note that the district court instructed the jury at each recess to avoid media coverage about the case and even specifically warned jurors to avoid certain news organizations that

8

were reporting on the proceedings. Defendant therefore has not shown prejudice arising from the jury's exposure to publicity during the break.

{12} In short, we conclude that the circumstances warranted a continuance and the recess did not deny Defendant his right to a fair trial. The recess in deliberations thus fell within the wide "scope of the trial court's inherent authority to control and manage trial proceedings and preserve the integrity of the trial process." *Smith*, 2016-NMSC-007, ¶ 71 (brackets, internal quotation marks, and citation omitted). We therefore decide that the district court did not abuse its discretion by denying Defendant's first motion for mistrial.

**2. Defendant's second motion for mistrial**

{13} We next consider the district court's decision to deny Defendant's second motion for mistrial and to resume deliberations on November 9, 2022. Defendant asserts that the court's decision to resume deliberations denied him a fair trial because the jury was at risk of rushing to judgment on return from the break. Defendant points out that one juror had a doctor's appointment on the morning of November 10, 2022, and another juror was unavailable on November 11, 2022, due to prearranged travel.

{14} However, before resuming deliberations, the district court asked the jurors to inform the court if they would feel rushed to reach a verdict. None of the jurors

indicated that they would feel rushed. The district court also sought and obtained permission for the jury to deliberate one hour past the courthouse's closing time on November 9, and the jury would have been able to deliberate for almost a full day on November 10 before breaking for a long weekend. Given these circumstances, the district court logically determined that there was sufficient time to resume deliberations on November 9.

{15} The timing of the jury's verdict fails to indicate that the jury felt rushed to reach a verdict. Although the jury returned its verdict shortly after resuming deliberations, the jury had already deliberated for a half day and on strong evidence of Defendant's guilt. More to the point, we review the district court's decision to resume deliberations based on the circumstances as presented at the time of the court's decision, not in hindsight. *Cf. State v. Perez*, 1980-NMSC-143, ¶ 5, 95 N.M. 262, 620 P.2d 1287 (evaluating whether the district court abused its discretion by denying a motion for a continuance based on information available to the court at the time of its decision). We therefore do not see an abuse of discretion in the district court's decision to deny Defendant's second motion for mistrial and resume deliberations on November 9.

{16} In sum, the district court denied Defendant's two motions for mistrial after carefully weighing the facts and circumstances presented. We see no

misunderstanding of law in the district court's decisions. We therefore conclude that the district court did not err by denying Defendant's two motions for mistrial.

**B.      Sufficiency of the Evidence for the Conspiracy Conviction**

{17}      For his second issue, Defendant asserts that his conviction for conspiracy to commit first degree murder was based on insufficient evidence. In reviewing whether sufficient evidence supports a conviction, we consider "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Sutphin*, 1988-NMSC-031, ¶ 21. Our task is to determine whether, on careful scrutiny of the record, "*any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862.

{18}      When reviewing the record, we view the evidence in the light most favorable to the jury's verdict, remaining cognizant that "the jury is free to reject Defendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). This Court will "not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (brackets,

11

internal quotation marks, and citation omitted). And "[w]e are at all times mindful of the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Gallegos*, 2011-NMSC-027, ¶ 15, 149 N.M. 704, 254 P.3d 655 (internal quotation marks and citation omitted).

**1.      Factual background to Defendant's conspiracy conviction**

{19}    Defendant was convicted of crimes surrounding the murder of his elderly aunt, Josephine Ortega, at her Northeast Albuquerque home. Defendant's ex-girlfriend, Evonne Jaramillo, served as the State's primary witness at trial. According to Jaramillo, Defendant murdered Ortega because he needed money to pay off a $50,000 drug debt and knew that his aunt kept a large amount of cash in her home.

{20}    Jaramillo testified that, on the night of the murder, she drove a rental car to an apartment complex in Ortega's neighborhood. Jaramillo met Defendant there and joined him in his truck. Sitting together in Defendant's truck, Jaramillo gave herself "eighty ccs" of heroin and then administered "a whole syringe full" of methamphetamine to Defendant.

{21} A short while later, they drove over to Ortega's house and parked on the street. Defendant then called Ortega using Jaramillo's cell phone, telling Ortega that he was outside and wanted to talk. Ortega, who lived alone, let Defendant inside her home.

{22} Jaramillo testified that she waited outside for approximately twenty-five minutes while Defendant was inside Ortega's home. Jaramillo said she spent most of this time waiting in the truck, but at one point she exited the vehicle, looked around the outside of the house, smoked a cigarette, and urinated next to Ortega's home. Defendant eventually returned wearing latex gloves and carrying a plastic shopping bag. The bag contained approximately $98,000 in cash, although Jaramillo claimed not to know what was in the bag at the time Defendant left the house.

{23} Defendant and Jaramillo drove off together in Defendant's truck, leaving Jaramillo's rental car at the apartment complex near Ortega's home. Later that evening, while Defendant counted the money in the couple's RV, Jaramillo asked how Defendant got the money from Ortega. Defendant told her that "he had to kill her for it." When Jaramillo stated that she had not heard a gunshot, Defendant replied that he had suffocated Ortega because he did not want the neighbors to hear. Jaramillo testified that Defendant gave her some of the money, paid off his debt, and bought more drugs.

13

{24} Ortega's friend, Ninfa Martinez, testified that she arrived the next morning to pick up Ortega for a monthly lunch date. Martinez discovered the front door to Ortega's house slightly ajar, the sliding back door wide open, and the bedrooms in disarray. Ortega was found lying face down on the floor of her bedroom. Ortega's hands had been restrained behind her back with zip ties. Two plastic shopping bags and a kitchen trash bag had been placed over her head and secured around her neck with duct tape. A medical examiner concluded that Ortega had asphyxiated due to obstruction of her airway and that the manner of death was homicide.

{25} About a week prior to the murder, Defendant and Jaramillo were recorded on video surveillance shopping together at a Northeast Albuquerque Walmart. According to a receipt later obtained by investigators, Defendant purchased zip ties, latex gloves, wet wipes, and a flashlight along with a few miscellaneous items. The zip ties were the same brand and type of zip ties that were used to restrain Ortega. At trial, Jaramillo admitted to shopping with Defendant but testified that she did not know what Defendant was purchasing at the time. However, surveillance videos show Jaramillo pushing a nearly empty cart with the zip ties visible from checkout and later leaving the store carrying a plastic shopping bag with the zip ties poking out from the top.

{26} Also about a week prior to the murder, Defendant visited Ortega for Mother's Day, bringing her donuts and flowers. It had been around two years since Defendant had last visited. Jaramillo also waited outside Ortega's home in Defendant's truck during this Mother's Day visit.

**2. Defendant's conspiracy conviction is supported by substantial evidence**

{27} We now consider whether the record supports Defendant's conviction for conspiracy to commit willful and deliberate first degree murder. "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state." NMSA 1978, § 30-28-2(A) (1979). "The gist of conspiracy under the statute is an agreement between two or more persons to commit a felony." *Gallegos*, 2011-NMSC-027, ¶ 25 (internal quotation marks and citation omitted). "Conspiracy is a specific intent crime." *State v. Varela*, 1999-NMSC-045, ¶ 42, 128 N.M. 454, 993 P.2d 1280. "In order to be convicted of conspiracy, the defendant must have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *Gallegos*, 2011-NMSC-027, ¶ 25 (internal quotation marks and citation omitted). "[I]t is not necessary in order to establish a conspiracy to prove a formal agreement to accomplish the illegal act." *State v. Deaton*, 1964-NMSC-062, ¶ 5, 74 N.M. 87, 390 P.2d 966. "Due to the typically clandestine nature of conspiracies, the prosecution's proof of a conspiracy is seldom

direct evidence of the agreement." *State v. Saiz*, 2017-NMCA-072, ¶ 24, 404 P.3d 422. A conspiracy, therefore, may be established by circumstantial evidence, as "[g]enerally, the agreement is a matter of inference from the facts and circumstances." *Gallegos*, 2011-NMSC-027, ¶ 26 (internal quotation marks and citation omitted).

{28} The parties agree that the jury instruction on Defendant's conspiracy charge is law of the case and controls our inquiry into the sufficiency of the evidence supporting his conviction. *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409. As relevant to our analysis, the jury was instructed as follows:

> For you to find the defendant guilty of conspiracy to commit first degree murder by a deliberate killing as charged in Count 2 or conspiracy to commit kidnapping as charged in Count 4 or conspiracy to commit aggravated burglary as charged in Count 6, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant and another person by words or acts agreed together to commit first degree murder by a deliberate killing or kidnapping or aggravated burglary;
>
> 2. The defendant and the other person intended to commit first degree murder by a deliberate killing or kidnapping or aggravated burglary;
>
> 3. This happened in New Mexico on or between the 18th and 19th days of May, 2017.

The jury found that Defendant had conspired to commit first degree murder, kidnapping, and aggravated burglary. Consistent with our case law, the district court

16

vacated the conspiracy to commit kidnapping and conspiracy to commit aggravated burglary convictions on double jeopardy grounds, leaving in place Defendant's conviction for conspiracy to commit first degree murder by deliberate killing. *See Gallegos*, 2011-NMSC-027, ¶ 55 (explaining that the Legislature intended to establish "a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed").

{29}    Defendant asserts that insufficient evidence supports the jury's finding that Defendant and another person agreed to commit deliberate murder. He emphasizes testimony by Jaramillo where she claimed not to know that Defendant was going to murder Ortega. For example, Jaramillo testified that she did not pay attention to the items Defendant purchased at Walmart that were likely used in the killing, that she did not enter Ortega's home on the night of the murder, and that she did not know what was in the plastic shopping bag Defendant was carrying when he returned to his truck. Defendant also referenced other parts of Jaramillo's testimony where she suggested that she only learned that Defendant killed Ortega later that evening, when she asked him how he got the money. Defendant argues that this testimony shows that he and Jaramillo did not agree to deliberately kill Ortega.

{30} However, Jaramillo's testimony claiming ignorance of Defendant's actions was contradicted by other evidence of the couple's activities before and during the night of the murder. For example, Jaramillo testified that she knew Defendant's motive for killing Ortega. Defendant told Jaramillo that he owed approximately $50,000 to a "street brother" named Jesse and that Defendant's immediate family was in danger if he did not repay the debt. He also told Jaramillo that he knew that Ortega kept a large amount of cash in her home.

{31} The State also submitted evidence showing that Jaramillo helped Defendant plan to carry out the murder. There was testimony that Defendant visited his aunt for the first time in two years about a week prior to the murder. Jaramillo testified that she waited outside in Defendant's truck during this visit. The jury could reasonably infer that Defendant and Jaramillo visited Ortega in preparation for the murder.

{32} Also, around a week prior to the murder, Defendant and Jaramillo shopped at a Northeast Albuquerque Walmart and purchased items that the jury could reasonably infer were used in the murder, including the zip ties used to restrain Ortega. Although Jaramillo claimed that she did not know what Defendant was purchasing, video surveillance shows that Jaramillo pushed a nearly empty cart with the items through the store, was with Defendant as he paid for the items at checkout, and carried the purchases out of the store. In view of this video evidence, the jury

18

could have reasonably rejected Jaramillo's claim that she was oblivious to what Defendant was purchasing.

{33}    Defendant's and Jaramillo's activities on the night of the murder also support an agreement to deliberately kill Ortega. Jaramillo testified that she drove separately to meet Defendant in Ortega's neighborhood. She then joined Defendant in his truck, where they got high together and drove to Ortega's house. Defendant borrowed Jaramillo's cell phone to call Ortega, asking if he could come inside. Ortega knew the Defendant, as he was her nephew and had recently visited. Defendant made no efforts to conceal his identity when entering Ortega's home, creating a reasonable inference that Defendant entered the home intending to kill his aunt after robbing her since she knew him and would be able to identify him.

{34}    Jaramillo testified that she waited in Defendant's truck for nearly half an hour while Defendant was in Ortega's home. Although Jaramillo asserted that she did not go inside the house, Jaramillo admitted that she smoked a cigarette which was found on Ortega's back patio. Jaramillo also admitted that she urinated next to Ortega's home. According to Ortega's friend who discovered Ortega the next morning, the sliding back doors to the house were wide open the morning after the murder. Based on this evidence, the jury could reasonably infer that Jaramillo either went inside

Ortega's home or at least went close enough to know what Defendant was doing inside the home.

{35}     Jaramillo also testified that, after the murder, Defendant joined her in the truck carrying a plastic bag containing "hundred-dollar bills." Jaramillo claimed not to know what was in the bag at the time; yet Jaramillo later accepted some of the money when Defendant gave it to her. Jaramillo also drove off with Defendant in his truck, abandoning her rental car at a nearby apartment complex. The State's theory at trial was that Jaramillo served as Defendant's lookout. We agree that this was a reasonable inference based on all of the evidence presented. Indeed, we discern that the jury likely believed Jaramillo insofar as she implicated Defendant in the murder, but disbelieved Jaramillo's claims of ignorance about the murder as merely an attempt to minimize her own culpability. We defer to the jury's determinations of witness credibility. *See Garcia*, 2016-NMSC-034, ¶ 15.

{36}     Viewing the record in favor of the jury's verdict, sufficient evidence shows beyond a reasonable doubt that Defendant and Jaramillo conspired to deliberately murder Ortega. From the testimony and exhibits presented, the jury could reasonably infer that Defendant and Jaramillo both knew of and participated in a scheme that involved burglarizing, kidnapping, and killing Ortega in order to obtain the cash in her home, and we defer to such reasonable inferences. *See State v. Sena*, A-1-CA-

38819, mem. op. ¶ 5 (N.M. Ct. App. Oct. 22, 2020) (showing deference to a jury's reasonable inference of a conspiracy based on circumstantial evidence alone); *Gallegos*, 2011-NMSC-027, ¶ 26 ("The agreement need not be verbal, but may be shown to exist by acts which demonstrate that the alleged co-conspirator knew of and participated in the scheme." (internal quotation marks and citation omitted)). We therefore conclude that the State presented sufficient evidence on which the jury could find that Defendant and Jaramillo conspired to commit first degree murder by deliberate killing.

## C. Ineffective Assistance of Counsel

{37} Defendant raises ineffective assistance of counsel as his third and final issue on appeal. Specifically, Defendant contends that counsel was deficient because three months was an insufficient amount of time to prepare for his defense.

{38} Defendant was charged with crimes associated with Ortega's murder on April 3, 2018. Throughout most of the pretrial proceedings, Defendant was represented by privately retained counsel. On June 30, 2022, defense counsel moved to withdraw based on a concurrent conflict of interest that had arisen while the case was pending. The district court granted the motion to withdraw over Defendant's objection and appointed the Law Offices of the Public Defender to represent Defendant. Trial counsel entered her appearance on July 26, 2022. Soon after, counsel moved to

21

continue a September 2022 trial setting and asked that trial be rescheduled for November 1, 2022, or later. The district court subsequently scheduled trial for October 25 through November 7, 2022.

{39} Defendant concedes that the district court effectively granted his counsel's motion to continue with this late October trial setting. Thus, we do not consider whether denial of a continuance was an abuse of discretion or resulted in the denial of effective assistance of counsel. *See State v. Salazar*, 2007-NMSC-004, ¶¶ 13-14, 141 N.M. 148, 152 P.3d 135 (articulating the standard of review for claims that the district court abused its discretion in denying a continuance and that the denial of a continuance led to ineffective assistance of counsel); *see also State v. Brazeal*, 1990-NMCA-010, ¶ 15, 109 N.M. 752, 790 P.2d 1033 (evaluating whether the denial of a continuance amounted to ineffective assistance of counsel). Rather, Defendant asserts that three months was insufficient time for trial counsel to prepare to defend him because he was facing capital charges, the State's case relied on multiple witnesses and hundreds of exhibits, and trial counsel had other trials scheduled in the three-month time period between her entry of appearance and trial.

{40} An ineffective assistance of counsel claim has two components: first, the defendant must show that "counsel's performance was deficient," and second, the defendant must show that counsel's "deficient performance prejudiced the defense."

22

*State v. Hunter*, 2006-NMSC-043, ¶ 12, 140 N.M. 406, 143 P.3d 168 (internal quotation marks and citation omitted). Counsel's performance was deficient if the performance "fell below an objective standard of reasonableness . . . tak[ing] into account all of the circumstances surrounding the defense." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (internal quotation marks and citation omitted). Counsel's deficient performance prejudiced the defendant if "there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *Id.* ¶ 27. A defendant usually bears the burden of establishing both deficiency and prejudice in an ineffective assistance of counsel claim; however, we will presume prejudice on rare occasions where it is unlikely that any counsel, though fully competent, would be able to render effective assistance. *State v. Grogan*, 2007-NMSC-039, ¶ 12, 142 N.M. 107, 163 P.3d 494; *United States v. Cronic*, 466 U.S. 648, 659-60 (1984). For example, we presume prejudice when a defendant was completely denied the assistance of counsel at a critical stage of proceedings, when counsel entirely "fail[ed] to subject the prosecution's case to meaningful adversarial testing," or where the defendant was "denied the right of effective cross-examination." *Grogan*, 2007-NMSC-039, ¶ 12 (internal quotation marks and citation omitted); *see also State v. Hildreth*, 2022-NMSC-012, ¶ 32, 506 P.3d 354; *Cronic*, 466 U.S. at 659.

{41} After reviewing the record, we conclude that Defendant has not shown his trial counsel's performance was deficient. Although counsel was appointed only three months prior to trial, the case was relatively straightforward and trial counsel had the benefit of prior counsel's preparations. *Cf. State v. Hernandez*, 1993-NMSC-007, ¶ 24, 115 N.M. 6, 846 P.2d 312 (listing factors for considering ineffective assistance of counsel claim based on denial of a continuance, including "the amount of time available to prepare a defense, the complexity of the issues involved in the case, the experience of trial counsel, and the reasons proffered by trial counsel for requesting a continuance"). Trial counsel also pursued a reasonable defense strategy, arguing in closing that Jaramillo carried out the murder with other accomplices and only incriminated Defendant in exchange for a plea deal. And trial counsel also effectively cross-examined the State's witnesses and appeared to be well versed in the issues and evidence presented in the case. We therefore see no deficient performance arising from the amount of time that counsel had to prepare for trial.

{42} Defendant also has not shown that he was prejudiced by any deficient performance, and we do not view three months as being, per se, an insufficient amount of time to prepare for trial such that we would presume prejudice. For example, in *Brazeal*, our Court of Appeals concluded that a week was sufficient time for counsel to prepare because it "was a simple case, defense counsel was

24

experienced, and defense counsel was greatly aided in preparation by the prior work on the case." 1990-NMCA-010, ¶ 20. Similarly, the State's case against Defendant was relatively simple, trial counsel was experienced, and counsel was also aided by prior counsel's preparations. Thus, Defendant has not sustained his ineffective assistance of counsel claim.

## III.  CONCLUSION

{43}  The district court did not abuse its discretion in denying Defendant's two motions for mistrial. Defendant's conspiracy conviction is supported by sufficient evidence of an agreement to commit first degree murder. Defendant has not shown that his counsel was deficient or that he was prejudiced by counsel's deficient performance. We therefore affirm Defendant's judgment and sentence and remand this matter to the district court.

{44}  **IT IS SO ORDERED.**

_____

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Justice**

_____

**JULIE J. VARGAS, Justice**

**C. SHANNON BACON, Justice, dissenting**

**BACON, Justice (dissenting in part).**

{45} The State's evidence supporting the charge of conspiracy to commit first-degree murder by deliberate killing was thin. Because the evidence was purely circumstantial, the jury necessarily drew inferences to arrive at facts of consequence. The validity of those inferences gives me pause. They were not reasonable ones grounded in logic, sense, or reason. Instead, each necessary inference was either an implausible one based on overly broad generalizations and conjecture, or a plausible-but-improbable one selected from equally plausible competing inferences. So, although I join the majority in denying Defendant's claims that he was deprived of a fair trial and received ineffective assistance of counsel, I respectfully dissent from its holding that there was sufficient evidence supporting Defendant's conviction for conspiracy to commit first-degree murder by deliberate killing.

**I.      SUFFICIENCY OF THE EVIDENCE**

{46} This Court follows a deceptively simple test to determine whether a criminal conviction is supported by sufficient evidence. First, the evidence is viewed in the light most favorable to the verdict. *State v. Trossman*, 2009-NMSC-034, ¶ 16, 146 N.M. 462, 212 P.3d 350. Then, this Court must make "'a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a

27

reasonable doubt.'" *Id.* (quoting *State v. Lopez*, 2008-NMCA-111, ¶ 14, 144 N.M. 705, 191 P.3d 563). Although appellate courts are highly deferential to a jury's decisions, it is "the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Vigil*, 2010-NMSC-003, ¶ 4, 147 N.M. 537, 226 P.3d 636 (internal quotation marks and citation omitted). This principle necessarily requires a reviewing court to distinguish between conclusions based on reasonable inferences and those based on speculation—not always a straightforward task. *See Romero v. State*, 1991-NMCA-042, ¶ 38, 112 N.M. 291, 814 P.2d 1019 ("[T]he line between speculation and reasonable inference is not always clear."), *rev'd in part on other grounds*, 1991-NMSC-071, 112 N.M. 332, 815 P.2d 628.

{47}    In determining the line between reasonable inference and speculation, we have recognized "[e]vidence equally consistent with two hypotheses tends to prove neither . . . [and] does not, without more, provide a basis for adopting either one—

especially beyond a reasonable doubt."[1] *State v. Garcia*, 1992-NMSC-048, ¶ 32, 114 N.M. 269, 837 P.2d 862 (internal quotation marks and citation omitted). Put another way, if evidence plausibly, but could not *probably*, lead to a particular inference because the evidence—in the light most favorable to the verdict—equally supports multiple inferences, then any conclusion by the trier of fact would necessarily entail guesswork. *See State v. Stephenson*, 2017-NMSC-002, ¶ 26, 389 P.3d 272 ("Evidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition." (text

---

[1]This concept is divisive, but maintains acceptance in a number of jurisdictions. *See Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) ("Where any reasonable jurist would conclude that evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence . . . this Court must reverse because equipoise is tantamount to reasonable doubt." (internal quotations marks and citation omitted)); *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir. 2006) ("[W]here such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained." (internal quotation marks and citation omitted)); *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017) ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt." (text only) (citation omitted)). However, it is not without its criticisms. *See State v. Wall*, 2020 UT App 36, ¶ 54, 460 P.3d 1058 ("[T]he fact that we can identify an equally plausible alternative inference is not nearly enough to set [a] verdict aside." (second alteration in original) (internal quotation marks and citation omitted)); *State v. Chaney*, 967 S.W.2d 47, 54 (Mo. 1998) (en banc) ("Because the equally valid inferences rule is at war with the due process standard governing an appellate court's review of the sufficiency of evidence, the equally valid inferences rule should no longer be applied.").

only)[2] (citation omitted)). *Probability* is the ingredient that separates a reasonable inference from speculation. *See United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005) ("An inference is reasonable if it flows from logical and probabilistic reasoning, i.e., with experience serving as the touchstone, a jury's inference is permissible where there is a *reasonable probability* that the conclusion flows from the facts in evidence." (emphasis added) (internal quotation marks and citation omitted)).

{48}     Because this Court must not reweigh evidence nor substitute our judgment for that of the trier of fact, *see State v. Garcia*, 2005-NMSC-017, ¶ 12, 138 N.M. 1, 116 P.3d 72, the question for us is whether a reasonable trier of fact *could* find the inference to be probably true *when viewing the evidence in the light most favorable*

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

*to the verdict.*[3] *Cf. Huddleston v. United States*, 485 U.S. 681, 690 (1988) ("In determining whether the [g]overnment has introduced sufficient evidence to meet [Federal] Rule [of Evidence] 104(b), the trial court neither weighs credibility nor makes a finding that the [g]overnment has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides *whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence*." (emphasis added)); *see generally* David S.

---

[3]Our Court of Appeals has often said "[w]hen a defendant argues that the evidence and inferences present two equally reasonable hypotheses, one consistent with guilt and another consistent with innocence, our answer is that by its verdict, the jury has necessarily found the hypothesis of guilt more reasonable than the hypothesis of innocence." *State v. Montoya*, 2005-NMCA-078, ¶ 3, 137 N.M. 713, 114 P.3d 393. This is true, but the analysis does not stop there. The duty of this Court is to determine whether any rational trier of fact *could* have found the hypothesis of guilt more reasonable than other plausible alternatives. If, after looking at the evidence *relied upon* to support the verdict in the light *most favorable* to the verdict, we find—based on logic and reason—such evidence could not support a conclusion that an inference is probably true because other equally plausible alternatives exist, then a trier of fact would not be permitted to make the inference. This does not require a reweighing of the evidence, and is simply another way of asking whether the evidence was sufficient. *See State v. Vigil*, 1990-NMSC-066, ¶ 6, 110 N.M. 254, 794 P.2d 728 (describing the reasonable-hypothesis-of-innocence analysis as "nothing more than an application of the substantial evidence rule" (internal quotation marks and citation omitted)); *but see* Edward J. Imwinkelried, *The Legal Sufficiency Analysis of Genuine Battles of the Experts in Criminal Trials: The Unrealized Potential of the Supreme Court's Landmark Decision in* Jackson v. Virginia, 54 Crim. L. Bull. 1243 (2018) (explaining that courts that follow the reasonable-hypothesis-of-innocence analysis, or what Imwinkelried calls the "equal-evidence rule," "amplify" on the sufficiency-review standard).

Schwartz, *A Foundation Theory of Evidence*, 100 Geo. L.J. 95, 126 (2011) ("Indeed, foundation is the burden of production applied on a more specific level of detail, to items of evidence rather than to a claim as a whole. That accounts for why the standard is the same for both: evidence sufficient to support a finding.").

{49} In this case, in order for the State to prove conspiracy to commit murder it needed to prove Defendant agreed with another to commit first-degree murder by deliberate killing, and Defendant and another intended to commit first-degree murder by deliberate killing. The majority is right in concluding that the State presented sufficient evidence to prove Defendant and another, Jaramillo, arrived at an agreement to commit *some* act. However, the State did not present sufficient evidence to show *murder* was the objective of the agreement, or Jaramillo intended to commit murder.

{50} As discussed next, each of the evidentiary components of the State's case—viewed individually and then as a whole—falls short of establishing murder was the objective of the agreement between Defendant and Jaramillo.

## II. ANALYSIS

### A. Evidentiary Components

#### 1. Jaramillo's knowledge of Defendant's motive

{51} Jaramillo testified that Defendant told her he was in debt for $50,000 and his aunt kept a large amount of cash in her house. While evidence of motive can be used to support an inference of intent, mere *knowledge of* motive does little to prove agreement or intent. *See State v. Rojo,* 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (concluding the physical evidence supported deliberate intent "[w]hen combined with the evidence concerning [the d]efendant's motive for the killing"); *State v. Motes,* 1994-NMSC-115, ¶ 14, 118 N.M. 727, 885 P.2d 648 (considering evidence of motive in assessment of whether the defendant had a deliberate intent to kill). Even though Jaramillo knew *why* Defendant may have wanted to kill the victim, it does not follow that she knew Defendant intended to do so, nor does it lead to a plausible inference that she shared that motive. Further, considering Defendant's motive was to get money, the State did not introduce evidence to show that killing was a necessary or preferred method to accomplish the motive, and so there was a gap between the motive of theft and the act of killing left unfilled by the State.

33

**2.      Jaramillo accompanied Defendant to visit the victim a week prior**

{52}     The majority concludes because Jaramillo accompanied Defendant to visit the victim a week prior to the murder, a reasonable inference could be that Jaramillo agreed to and intended to commit murder. While I agree that Jaramillo's presence during this visit is sufficient to establish Defendant and Jaramillo had some sort of agreement to commit a crime involving the victim, nothing about the joint visit could reveal the probable crime. The State presented no evidence that could support a logical link between the visit to the victim and the planning of her murder, as opposed to planning any other criminal act against her.

**3.      Jaramillo was with Defendant when he purchased zip ties**

{53}     The State's evidence revealed, despite her assertions to the contrary, Jaramillo knew Defendant purchased zip ties and those zip ties could have been the same ones used in the murder. While Jaramillo's knowledge of the purchase of zip ties could lead to an inference that she and Defendant agreed to enact some criminal plan, zip ties do not prove murder could have been the likely plan. Zip ties, unlike a gun or hatchet or poison, could not lead to a probable inference of killing because many crimes against people involve restraint or fastening, and the State presented no evidence that Jaramillo knew or intended the zip ties would be used for such purposes during the course of a murder. That the zip ties were eventually used by

Defendant in the murder could not support a probable inference that Jaramillo knew or intended they would be used in such a way, as opposed to being used for any other crime involving restraint or fastening, because she was not present during the killing.

**4.      Jaramillo drove separately to the victim's neighborhood**

{54}    In its briefing, the State characterized the fact that Jaramillo drove to the victim's neighborhood separately as "odd." Oddities are the stuff of reasonable suspicion, not proof beyond a reasonable doubt. Characterizing the behavior as "odd" revealed the State itself could not find the logical link between driving separately and Jaramillo's agreement and intent to commit murder. The State's inability to articulate a logical link is understandable because there is not one. While driving separately and meeting at the same location could clearly show a scheme and plan, nothing about it makes murder a plausible plan. Without more, carpooling only circumstantially proves agreement, but has no tendency to show the objective of the agreement was murder.

**5.      Defendant and Jaramillo got high in Defendant's truck**

{55}    Like the fact that Jaramillo drove separately, the State characterized Defendant's and Jaramillo's drug use prior to the murder as "odd." For this fact, I disagree with that characterization, and believe drug use could have a reasonable explanation: viewed in the light most favorable to the State, drug use could

circumstantially show Defendant and Jaramillo were preparing to commit a crime, and they decided to alter their states of mind in order to help them do it. However, even assuming Defendant and Jaramillo intended to alter their states of mind with drugs, nothing about the drug use itself could reveal they both likely intended to commit murder rather than any other crime.

**6.     The murder**

{56}     I am cautious when examining the probative value of after-the-fact evidence because of its limited value in demonstrating earlier intent, in addition to the simple fact that hindsight bias can interfere with the reasoning process. That said, and with regard to the issues at hand, I accept that in certain circumstances the act of murder may circumstantially prove conspiracy to commit murder. *See State v. Torres*, 2018-NMSC-013, ¶ 51, 413 P.3d 467 (holding sufficient evidence supported conspiracy to commit murder when, *inter alia*, Defendant "went to the shooting scene [with two co-conspirators] before the shots were fired, [then] he ran back from the scene smelling like 'burned matches' immediately after the shots were fired"); *State v. Lopez*, 2005-NMSC-036, ¶ 25, 138 N.M. 521, 123 P.3d 754 (holding sufficient evidence supported conspiracy to commit first-degree felony murder when Defendant and co-conspirator "threw [the victim] into the well while he was alive . . . that they carefully, deliberately, even painstakingly first opened, then covered,

36

and finally re-sealed the well supports an inference that they reached an agreement to kill [the victim] in the course of the robbery and that both intended his death"); *State v. Nieto*, 2000-NMSC-031, ¶ 29, 129 N.M. 688, 12 P.3d 442 (holding sufficient evidence supported conspiracy to commit first-degree murder when the defendant, *inter alia*, incapacitated a witness while co-conspirators murdered and robbed victims). In this case, however, the act of murder itself was not probative of Defendant's and Jaramillo's agreement and intent to commit murder because of the way the murder occurred. The State presented no evidence showing Jaramillo did anything more than wait outside the house to stand lookout. Standing lookout could not lead to a probable inference that Jaramillo agreed and intended to commit murder because the concept of having a lookout is not logically connected with murder more than any other crime or nefarious act. Considering the State's motive evidence, the clear alternative front-runner would be robbery. Further, the act of murder was done completely by Defendant with no physical help from Jaramillo, and outside her presence. The State needed to put forward any fact about the murder probative of *mutual* agreement and intent *to commit murder specifically*. However, no such fact was presented, and thus the evidence left open a gap wherein inferences of agreement and intent to commit non-murder were equally as plausible as murder. Accordingly, the murderous act itself was not sufficient to prove it was the intended

objective of any agreement between Defendant and Jaramillo. *See Summers*, 414 F.3d at 1295, 1297 (holding "evidence of mere association or presence, *even when coupled with evidence of flight*, is not enough to support a conspiracy conviction," where government had to prove elements of "(1) an agreement between two or more persons to break the law, (2) an overt act in furtherance of the conspiracy's objects, and (3) that the defendant willfully joined in the conspiracy" (internal quotation marks and citation omitted)).

**7.     Conduct after the murder**

{57}     A defendant's state of mind *prior* to an act is the central inquiry of a crime based on deliberate intent. *See* Rule 14-201 NMRA ("The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action."). The State argues, and the majority agrees, Jaramillo's conduct following the murder circumstantially proves agreement and intent to commit murder. True, conduct following a crime can, in some instances, prove premeditation or deliberation by revealing a defendant's state of mind prior to the crime. *See Torres*, 2018-NMSC-013, ¶¶ 6, 51 (holding that a co-conspirator's statement to the defendant saying, "Oh we got the wrong . . . guy," was sufficient, *inter alia*, to prove conspiracy to commit first-degree murder). However, in this case Jaramillo's conduct after the murder showed nothing to prove

her state of mind prior to the murder, and I am reluctant to assign meaning to after-the-fact conduct that lacks a logical connection to the crime charged.

{58} First, Jaramillo drove away from the victim's house with Defendant, abandoning her rental car nearby. Assigning some further reason or significance to this act could only amount to pure speculation because abandoning a car has no logical link to a prior agreement nor intent to commit murder. At most, it could show a consciousness of guilt as to some involvement in the crime, but it is not indicative of Jaramillo's state of mind prior to the crime. *See Garcia*, 1992-NMSC-048, ¶ 31 (holding the defendant's attempt to conceal his identity from police "did not give rise to any inference as to his state of mind *before* the [killing]").

{59} Second, Jaramillo accepted some of the stolen money when Defendant gave it to her. Even viewing this evidence in the light most favorable to the State, which at most could support the conclusion that Jaramillo knew Defendant intended to steal money from the victim, the fact that Jaramillo accepted some of it does not plausibly support the conclusion that she agreed, intended, or even knew Defendant was going to kill the victim. Nothing about accepting the fruits of the crime indicated, in this case, Jaramillo's state of mind prior to the crime. *See id.*

**B.    The Evidence as a Whole**

{60}    Even though no individual evidenced fact suggested Defendant and Jaramillo both agreed and intended to commit murder, sufficiency review requires evidence be viewed as a whole. *State v. Gutierrez*, 2021-NMSC-008, ¶ 61, 482 P.3d 700 ("We view the evidence as a whole and in the light most favorable to the [s]tate."); *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 ("Th[e] divide-and-conquer approach is not contemplated in appellate review for sufficiency of the evidence."). In this case, the evidence as a whole could not lead a trier of fact to conclude Jaramillo conspired with Defendant to commit murder without filling in gaps with speculation. The primary gap the State did not—or could not—fill involved showing what crime, specifically, Jaramillo agreed to and intended to commit. While the triers of fact could have drawn reasonable inferences about Jaramillo's agreement and intent to commit some criminal act, any trier of fact would have needed to look beyond the evidence in order to convict for conspiracy to commit murder. *See State v. Slade*, 2014-NMCA-088, 331 P.3d 930 (stating while permissible logical inferences may be drawn from the facts, if they "'must be buttressed by surmise and conjecture' in order to convict, the conviction cannot stand" (quoting *State v. Tovar*, 1982-NMSC-119, ¶ 8, 98 N.M. 655, 651 P.2d 1299)). Leading up to the killing, there was not a single fact that could show Jaramillo

probably agreed to or intended to commit murder more than any other potential crime. Because a murder eventually occurred, it would be tempting for any trier of fact to work backwards and view every act between Defendant and Jaramillo to fit the outcome. Outcome-driven reasoning, however, is highly susceptible to conflating correlation with causation, which can lead to erroneous outcomes based not on logical inferences, but speculation that conveniently fits the verdict. That is what occurred in this case. Whatever happened in the house between Defendant and the victim was inevitably going to be taken as the purpose of a conspiracy between Defendant and Jaramillo. While the evidence supported the jury's conclusion that a conspiracy indeed existed, the State did not present sufficient evidence to show murder was the objective of the conspiracy. When a conclusion drawn from evidence is implausible, or plausible but improbable because equally (or *more*) plausible alternatives exist, speculation, guesswork, and conjecture are necessary to support a finding of guilt beyond a reasonable doubt. *See* Schwartz, *supra*, at 146 ("'Plausible fictionalizing' is a very good definition of speculation."). Because the jury in this case necessarily speculated to reach its guilty verdict on the charge of conspiracy to commit first-degree murder by deliberate killing, I respectfully dissent.

_____

**C. SHANNON BACON, Justice**

41